[Cite as *Bender v. Durrani*, 2024-Ohio-1258.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| MACKENZIE BENDER, | : | APPEAL NO. C-220326 |
| AMY YOUNG, | : | TRIAL NO. A-1506577 |
| and | : | |
| BOB BENDER, | : | *O P I N I O N.* |
| Plaintiffs-Appellees, | : | |
| vs. | : | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC., | : | |
| Defendants-Appellants, | : | |
| and | : | |
| WEST CHESTER HOSPITAL, LLC, | : | |
| and | : | |
| UC HEALTH, | : | |
| Defendants. | : | |
| | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 3, 2024

*Robert A. Winter, The Deters Law Firm, P.S.C.*, and *Benjamin M. Maraan, II, Statman Harris & Eyrich, LLC*, and *Alan J. Statman* for Plaintiffs-Appellees,

*Taft Stettinius & Hollister, LLP, Philip D. Williamson, Aaron M. Herzig, Russell S. Sayre*, and *Anna M. Greve, Lindhorst & Dreidam Co., L.P.A., James F. Brockman, Michael F. Lyon*, and *Paul J. Vollman* for Defendants-Appellants.

**BOCK, Judge.**

**{¶1}** When she was ten years old, a doctor diagnosed plaintiff-appellee Mackenzie Bender with mild scoliosis and advised her to watch and wait. The condition grew worse; yet, Mackenzie was not experiencing any pain.

**{¶2}** That changed. Defendant-appellant Dr. Abubakar Durrani performed a "Thoracic 5–thoracic 12 spine stapling" surgery. Post-surgery, Mackenzie began experiencing back pain for the first time. Her scoliosis became more severe.

**{¶3}** Mackenzie and her parents, plaintiffs-appellees Amy Young and Bob Bender (collectively, "the Benders"), sued Durrani and defendant-appellant The Center for Advanced Spine Technologies, Inc., ("CAST"). A jury returned verdicts finding Durrani and CAST (collectively, "defendants") liable for fraudulent misrepresentation and negligent medical treatment.

**{¶4}** Defendants appeal the trial court's judgment, asserting that the trial court erred by (1) denying their request for judgment notwithstanding the verdict, a new trial, or remittitur; (2) awarding the Benders prejudgment interest; and (3) denying defendants' motion for credit.

**{¶5}** Because any error committed by the trial court did not prejudice defendants, we affirm the trial court's judgment.

## I. BACKGROUND FACTS AND PROCEDURE

### A. DURRANI RECOMMENDED AND PERFORMED SURGERY ON MACKENZIE

**{¶6}** In October 2008, a physician diagnosed ten-year-old Mackenzie with mild scoliosis—she had a seven-degree curve in her spine. Because the curve in Mackenzie's spine was mild, her doctors advised her mother to "watch it and wait."

3

{¶7}   In September 2010, Young took Mackenzie to an orthopedic medical group. There, a physician noted that her scoliosis curve had progressed to 35 degrees. He referred her to Shriner's Hospital to treat her scoliosis.

{¶8}   In early November 2010, Young and Mackenzie visited Shriner's Hospital. By then, her spinal curve had progressed to 41 degrees. The doctor treating her at Shriner's Hospital did not recommend surgery. Instead, he referred Mackenzie to "the Brace Shop * * * to mold" a custom-made brace.

{¶9}   About four weeks later, Mackenzie returned to Shriner's Hospital. Her physicians ordered an x-ray of Mackenzie wearing the brace. That imaging showed that her spinal curve had "improved alignment," curving only 13 degrees. Her doctors determined that the brace was working, instructed Mackenzie to wear the brace full time, and asked the Benders to follow up in four months.

{¶10}   Mackenzie experienced no pain from the scoliosis, but the brace caused her pain and discomfort. Because Mackenzie did not like wearing the brace and she would have to wear it nearly constantly for years, Young took Mackenzie to consult with Durrani at CAST.

{¶11}   Although the CAST medical records were not in evidence to confirm the date of the visit, Young testified that Mackenzie's first appointment with Durrani was in December 2010. Accordingly, the appointment was no more than two months after Mackenzie began wearing the brace and was within a few weeks of the imaging reflecting a 13-degree curve when Mackenzie was wearing the brace.

{¶12}   At that first appointment, which, according to Young, lasted about ten minutes, Durrani told Mackenzie to stop wearing the brace. Instead, he said that Mackenzie needed surgery. He recommended that Mackenzie undergo a vertebral-

stapling surgery, which entailed stapling the side of her thoracic (middle) spine with the biggest curvature so that the smaller curvature would "self-correct" as she grew.

{¶13} Durrani told Young that vertebral-stapling surgery was minimally invasive and Mackenzie would have a quick recovery. He told her that within a few months of surgery, Mackenzie "would be back to normal" and would be able to return to her active lifestyle.

{¶14} In March 2011, Durrani performed the vertebral-stapling surgery on Mackenzie. Durrani told Young that the surgery had gone well.

{¶15} Mackenzie did not have any pain from the scoliosis before surgery. But she experienced severe post-surgical pain. She testified that her pain level got worse after the surgery and that it gets worse year after year. She said that the right sign of her body "is pushed backwards and more uneven than the left side" of her body. She had permanent scarring and changes to her anatomy. And Mackenzie's scoliosis progressed after surgery. The last image before trial showed that her curve had progressed to 51 degrees.

{¶16} In 2015, Mackenzie and her parents sued defendants, alleging, among other claims, negligence, lack of informed consent, and fraudulent misrepresentation.[1] Eventually, the case was tried to a jury.

B. **EXPERT TESTIMONY AND REPORTS**

{¶17} The experts reviewed medical records involving Mackenzie's imaging and Durrani's surgical notes, but because CAST's records were missing, they could not

---

[1] The Benders also sued West Chester Hospital, LLC, and UC Health, but the Benders dismissed their claims against them before trial.

review Durrani's office notes, such as his clinical impressions of Mackenzie during her appointments with him or his reasons for performing the surgery.

1) **The Benders hired a neurosurgeon who concluded that Durrani's treatment met the standard of care**

{¶18}  Before trial, the Benders hired Stephen Bloomfield to review the medical records and prepare an expert report. Bloomfield was a board-certified neurosurgeon with 25 years' experience evaluating and treating patients with spine disease. Bloomfield's report stated that Mackenzie's surgery was medically indicated, the surgery caused Mackenzie no obvious harm, and Durrani's treatment of Mackenzie met the standard of care. While Bloomfield did not testify at trial, the trial court permitted defendants to refer to this report during their expert neurosurgeon's testimony and to read portions of his report to the jury during their closing argument.

2) **Radiologists' testimony**

   a)  **Defendants' expert radiologist**

{¶19}  Dr. Myron Marx, a diagnostic radiologist, testified as an expert witness for defendants. Marx testified that he "use[s] imaging techniques to diagnose and follow the course of disease." Marx does not participate in any decision making involving spinal surgeries, including when to operate and what type of surgery to perform. Marx had no opinion on whether the surgery was medically indicated.

{¶20}  Marx testified that he had seen stapling procedures for about 20 years but had seen "more of them" in the past ten years. He was unable to answer some questions about scoliosis and vertebral-stapling procedures because "it's not my area."

{¶21}  Marx compared Mackenzie's imaging from 2008, 2010, 2011 (before and after the surgery), and 2017. Marx testified that comparing a March 2011 image to June 2011 showed that Mackenzie's spine was more curved in June 2011 than before

the surgery. A September 2011 image showed even more progression. And Marx conceded that the 2017 imaging showed that Mackenzie's scoliosis had progressed and that the progression was "not an insignificant progression." But he testified that the stapling procedure was not for the purpose of straightening the spine. Instead, it was to reduce the progression of the curve. He also testified that stapling is "not a hundred percent. It's not like having a tumor, taking it out. * * * This is a corrective procedure and there's a whole spectrum that we see of improvement to dramatic improvement to mild improvement to slight worsening."

### b) The Benders' expert radiologist

{¶22}   Dr. Ranjiv Saini, the Benders' expert radiologist, was a neuroradiologist. As such, he specializes in issues affecting the spinal cord and brain. While a diagnostic radiologist like Marx learns "everything in general," neuroradiologists spend two years studying nothing but the brain and spinal cord, and conditions affecting the brain, spinal cord, face, head, and neck. Saini spent "additional time just to study everything to do with imaging of the spinal cord, the head and neck, facial bones, the brain, and I did that for two years, and in addition to my regular diagnostic radiology."

{¶23}   Saini testified that although a surgeon makes the final decision about whether to perform a surgery, he is "the doctors' doctor." He receives clinical information from the treating physician, studies the images, and tells physicians what he believes is the correct thing to do.

{¶24}   Saini testified that Mackenzie's physician at Shriner's Hospital noted that her spinal curvature significantly progressed from October 2008 to 2010, so they made her a brace. He testified that Shriner's Hospital "treat[s] more cases of scoliosis

7

than just about any other hospital in this country. I don't know the exact statistics, but they treat a lot."

{¶25} A month after Shriner's Hospital physicians referred Mackenzie for a brace, her spinal curve while wearing the brace was 13 degrees. Saini agreed with Mackenzie's Shriner's Hospital doctors that Mackenzie's condition was not severe enough to require surgery, and that for a growing person, only a curve greater than 45 degrees could require surgery. According to Saini, with the brace on, Mackenzie's scoliosis was "very mild."

{¶26} Saini testified that because Durrani instructed Mackenzie to stop wearing the brace at her first appointment in December 2010, it appeared that her scoliosis had progressed by February 2011, but it was still in a range not severe enough to justify surgery. He emphasized that for people with growing bones, conservative therapy with a brace is what most physicians recommend because stapling "permanently fuses the curve." Saini testified that he had reviewed hundreds of thousands of cases from orthopedic surgeons and neurosurgeons and had never seen a spinal stapling procedure before Mackenzie's. Saini testified that a "very minority number" of scoliosis patients require any surgery.

{¶27} Saini explained that Mackenzie had a "permanent curve because of experimental surgery. It can never reverse. It can never go back."

3) **Surgeons' testimony**

   a) **The Benders' expert surgeon**

{¶28} Dr. Errol Mortimer, a 24-year pediatric orthopedic surgeon, worked full-time as an orthopedic surgeon and was an assistant professor, teaching medical students and residents. He testified that neurosurgeons do not usually treat scoliosis;

instead, pediatric orthopedic surgeons treat scoliosis. Though he had stopped performing spinal surgeries five years earlier, he had performed approximately 400 spinal surgeries during his career. Mortimer testified that an important difference between pediatric and adult orthopedic surgeons is that pediatric orthopedic surgeons consider how a child's bones will grow and what happens as the child ages.

{¶29} Mortimer testified that Durrani breached the standard of care by recommending and performing surgery on Mackenzie. Further, according to Mortimer, Durrani knowingly misrepresented to the Benders the need for the surgery because he recommended surgery as a better alternative to bracing.

{¶30} Mortimer said that the standard initial treatment for a child with scoliosis like Mackenzie's is a brace. He had treated thousands of scoliosis patients with braces and noted that doctors should always solve medical problems by employing less-invasive treatments.

{¶31} Mortimer explained that once a scoliosis patient obtains a brace, an orthopedic surgeon reviews x-rays with the brace on to determine whether the brace is effective. Doctors look for the patient's spinal curvature to decrease by at least 50 percent, which shows that the patient's spine is flexible. When a curve is decreased by 50 percent or more, "there's a very, very good chance that this will be a good long-term outcome."

{¶32} Mortimer described Mackenzie's result after only a month of wearing the brace: "It's not a good result, it's a great result * * * you cannot expect a better result." He testified that there was a good chance that "Mackenzie would have been able to avoid any kind of surgery at all." He stated that by trying a brace for a year and seeing what happens, "[y]ou lose nothing."

9

{¶33} Mortimer testified that Durrani's recommending surgery and telling Mackenzie to stop wearing the brace, after only a few weeks of Mackenzie wearing the brace and having such a positive result, was in "clear defiance of the national standard for treating people with scoliosis." In fact, even if Mortimer had treated a child with a significantly less positive result in the brace, he still would have told the family to continue with the brace. And though Mortimer acknowledged that Mackenzie complained of pain from the brace, he testified that "[l]iterally 100 percent of children that we treat with a brace complain of discomfort to some degree."

### b) Defendants' surgical expert

{¶34} Defendants' surgical expert witness was neurosurgeon Dr. Paul Kaloostian. At the time of the 2019 trial, Kaloostian had been practicing medicine independently (outside of training) for seven years. In 2011, the year that Durrani operated on Mackenzie, Kaloostian was in his residency. During his residency, he performed instrumentation and fusion surgeries—correcting spines with screws and rods. He did not perform or participate in any vertebral-stapling procedures during his residency.

{¶35} Kaloostian had never performed a vertebral-stapling surgery. During his fellowship, Kaloostian assisted in a single surgery involving vertebral stapling. That was the only vertebral-stapling procedure he had ever seen in his career. "Other than that, [he] definitely ha[d] knowledge about it, just general knowledge about the anatomy and the patients that can benefit from it and the process of how to do the procedure."

{¶36} Since that point, when he encountered patients with "significant scoliosis, I don't really feel comfortable, you know, providing them the entire breadth

of options available. So I usually refer them to major big centers like UCLA or USC or Hopkins, you know, big hospitals that do these procedures like stapling and all of these other minimally invasive options." In his practice, Kaloostian "normally do[es] the standard screws and rods type of procedures. That's just what I'm comfortable with. That's what I've been trained with most commonly."

{¶37} During his fellowship, Kaloostian was involved in approximately 15-20 pediatric scoliosis bracing cases, and "maybe" 30 during his residency. In his private practice, Kaloostian had not treated any pediatric scoliosis patients.

{¶38} Kaloostian testified that Durrani had acted "prudently, reasonably, and within the standard of care" in all aspects of his treatment of Mackenzie, including recommending the vertebral-stapling procedure and his performance in the surgery itself. He had reviewed Bloomfield's report and agreed with Bloomfield that Durrani's treatment of Mackenzie met the standard of care.

{¶39} Kaloostian testified that Mackenzie's increase in curvature of her spine from 2008 to 2010—from seven degrees to about 40 degrees—was "pretty significantly changed." Further, he testified that where a patient's scoliosis is rapidly increasing and if the patient "does not want to, you know, keep wearing the brace all the time, which can be uncomfortable, the options are surgical intervention." He opined that Mackenzie had "actually improved from the surgery and has no long-term deficits associated with the surgical procedure." He testified that he believed additional surgery for Mackenzie was unnecessary at the time, but it was possible Mackenzie would require instrumentation (fusion with rods and screws) surgery in the future.

{¶40} Kaloostian testified that he disagreed with the Benders' experts' testimony that vertebral-stapling procedures were experimental. He began to refer to

11

a book to bolster his testimony, but the trial court sustained an objection because that book had not been entered into the evidence. He testified that the articles defendants had admitted into the evidence were authoritative and reliable but did not connect these articles to his opinion that the procedure was not experimental. Kaloostian testified that vertebral-stapling procedures were "more on the rare side."

{¶41} Kaloostian agreed with the Benders' counsel that the literature that Kaloostian had described as an "authoritative source" stated that vertebral-stapling surgeries had a "significant failure rate"—around 70 percent—when the patient's spinal curvature is greater than 40 degrees. Kaloostian agreed that Mackenzie's medical records from November 2010 showed that her thoracic spinal curve was 41 degrees. Later, however, Kaloostian said that a February 2011 image showed that Mackenzie had a 34-degree curve, which the literature reported had a high success rate.

{¶42} Kaloostian described the tools available to treat scoliosis in 2011: first, medical management, or controlling the pain with medication; second, putting the patient in a brace and see how they do over time; and third, surgery. He testified, "If someone is not really clinically affected by a curvature, I would highly recommend avoiding surgical intervention which could be fraught with complications." And when asked whether the typical treatment for a pediatric scoliosis patient with a 50-degree or less curve was bracing, Kaloostian responded, "Yeah. Always start with conservative routes, absolutely."

## C. VERDICT AND POSTTRIAL MOTIONS

{¶43} The jury returned a verdict in the Benders' favor on their medical-negligence and fraudulent-misrepresentation claims. The jury found against the

12

Benders on their informed-consent claim. The jury awarded the Benders $318,415.07 in compensatory damages: $57,837.21 for past medical expenses, $10,577.86 for future medical expenses, and $250,000 for past pain and suffering. It also awarded $250,000 in punitive damages.

{¶44} In May 2019, the Benders moved for prejudgment interest. The trial court denied that motion. Later, the Benders filed for posttrial discovery in support of prejudgment interest.

{¶45} In June 2020, defendants filed a motion for judgment notwithstanding the verdict, a new trial, and/or remittitur, which the trial court denied. Defendants also moved for a setoff against plaintiffs' judgment in the amount of their settlements with West Chester Hospital and UC Health, which the trial court also denied.

{¶46} In January 2021, the Benders filed a motion to reconsider the trial court's decision on prejudgment interest. The trial court held an evidentiary hearing in March 2021 and denied the motion for reconsideration, finding that defendants had a good-faith, objectively reasonable belief that they had no liability for Mackenzie's injuries based on the report provided by Bloomfield, which concluded that Durrani had met the standard of care in Mackenzie's treatment. Ten days later, the Benders filed both a notice that they were withdrawing their motion for prejudgment interest, despite the trial court having already denied that motion, and, three minutes later, a motion to set aside the decision denying their prejudgment-interest motion. Then, in April 2021, the trial court granted the Benders' motion to set aside its March 2021 decision denying the motion for prejudgment interest and vacated that decision.

{¶47} In January 2022, the trial court held another evidentiary hearing on prejudgment interest. The court noted that the Benders' former counsel had filed a

motion for prejudgment interest followed by a motion to withdraw it. Defendants' counsel participated in the hearing, recounted the procedural history involving prejudgment interest, but did not object to the trial court's holding the hearing. In February 2022, the court granted the Benders' prejudgment-interest motion.

{¶48} The trial court rendered its final judgment in favor of the Benders. It awarded the Benders $318,415.07 in compensatory damages, $250,000 in punitive damages, $71,445.75 in attorney fees, $502 in court costs, and $83,051.21 in prejudgment interest.

## II. LAW AND ANALYSIS

{¶49} Defendants assert three assignments of error, arguing that the trial court erred by (1) denying their post-judgment motions, (2) awarding the Benders prejudgment interest, and (3) denying defendants' motion for credit.

### FIRST ASSIGNMENT OF ERROR

{¶50} Defendants first assert that the trial court erred by denying their motion for judgment notwithstanding the verdict ("JNOV"), a new trial, or remittitur. Because we find no prejudicial error, we overrule defendants' first assignment of error.

### A. DEFENDANTS WERE NOT ENTITLED TO A NEW TRIAL

{¶51} Defendants' first issue for review asserts that the trial court erred by not granting them a new trial, arguing that the trial court made multiple prejudicial evidentiary errors.

{¶52} New-trial motions are governed by Civ.R. 59. *Adams v. Durrani*, 2022-Ohio-60, 183 N.E.3d 560, ¶ 20 (1st Dist), quoting Civ.R. 59(A). Courts may grant new-trial motions when there are irregularities in the trial proceedings, the weight of the evidence is contrary to the judgment, or for other good cause. *Id.*, quoting Civ.R. 59(A).

14

We review a trial court's ruling on a new-trial motion for an abuse of discretion, and we must construe the evidence in favor of the trial court's ruling. *Id.*

{¶53} We review a trial court's evidentiary decisions for an abuse of discretion. *Rusin v. Buehrer*, 2017-Ohio-8411, 99 N.E.3d 1120, ¶ 25 (1st Dist.). "An abuse of discretion connotes more than a mere error of judgment; rather, 'it implies that the court's attitude is arbitrary, unreasonable, or unconscionable.' " *Hayes v. Durrani*, 1st Dist. Hamilton No. C-190617, 2021-Ohio- 725, ¶ 8, quoting *Boolchand v. Boolchand*, 1st Dist. Hamilton Nos. C-200111 and C-200120, 2020-Ohio-6951, ¶ 9. An abuse of discretion occurs when "a court exercis[es] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35.

{¶54} Defendants argue that the trial court erred by admitting (1) improper character evidence, which consisted of testimony about Durrani's medical license revocations, prior lawsuits against Durrani, Durrani's absence during the trial, and Dr. Zeeshan Tayeb's "misleading hearsay," and (2) a neuroradiologist's testimony that Durrani's treatment fell below the standard of care. Further, defendants argue that these errors cumulatively entitle them to a new trial.

{¶55} For ease of discussion, we first determine whether any of the trial court's evidentiary rulings were erroneous. Then we look at any errors together to determine whether they prejudiced defendants.

## 1. **Character evidence**

{¶56} Generally, all relevant evidence is admissible. Evid.R. 402; *State v. Terry*, 1st Dist. Hamilton No. C-230049, 2023-Ohio-3131, ¶ 7, quoting *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 11.

15

**{¶57}** Evid.R. 403, however, provides "exceptions to this general principle and provides circumstances for the exclusion of relevant evidence." *Terry* at ¶ 7, citing Evid.R. 403. One exception rendering relevant evidence inadmissible is when the probative value of that evidence "is substantially outweighed by the danger of unfair prejudice." *State v. Brown*, 2d Dist. Montgomery No. 24541, 2012-Ohio-1848, ¶ 31, citing Evid.R. 402 and 403(A).

**{¶58}** And Evid.R. 404(B) generally disallows evidence of other crimes, wrongs, or acts when the evidence is used to prove a person's character and to show a person's actions conformed with those other bad acts. *Hounchell v. Durrani*, 2023-Ohio-2501, 221 N.E.3d 1020, ¶ 33 (1st Dist.).

**{¶59}** We note that in this appeal, like in multiple other appeals involving Durrani, defendants assert that portions of the "Durrani collage" prejudiced them. The Durrani collage compiled excerpts from depositions of Durrani. It does not reference Mackenzie at all. Instead, the testimony involves Durrani's Pakistani heritage, his medical license revocations, and unrelated lawsuits filed against Durrani.

### a) Evidence of other lawsuits against Durrani

**{¶60}** Defendants assert that the trial court erred by permitting evidence of other lawsuits against Durrani, which were referenced in the Durrani collage.

**{¶61}** This court has held in other Durrani appeals that evidence involving other lawsuits is inadmissible because the evidence is not related to the medical treatment that he provided and there was no evidence admitted about the nature of those other lawsuits. *See Hounchell*, 1st Dist. Hamilton No. C-220021, 2023-Ohio-2501, at ¶ 51; *Nichols v. Durrani*, 1st Dist. Hamilton No. C-220350, 2023-Ohio-3177, ¶ 28.

{¶62} Accordingly, we hold that because the references to other lawsuits had no bearing on whether Durrani provided proper medical treatment to Mackenzie, the trial court erred by permitting evidence of other lawsuits.

### b) License revocation

{¶63} Durrani argues that references to Dr. Durrani's medical license being revoked "plagued this trial" and prejudiced defendants.[2]

{¶64} During trial, the Benders' counsel raised Durrani's license revocations as follows: (1) voir dire ("Dr. Durrani's licenses were revoked in Ohio and Kentucky. * * * He was licensed, though, when this surgery occurred."), (2) opening statement ("[H]is Ohio and Kentucky license has been revoked."), and (3) during the case-in-chief via the Durrani collage ("Q: Isn't it true that on March 12th, 2014, your medical licenses was [sic] permanently revoked by the State of Ohio? A: I already said it in my opening statement, that was extremely unfair action. Q: Isn't it true in April 2014 your Kentucky medical license was revoked? A: I wasn't there, so I have no idea.") Finally, during closing argument, while counsel did not directly refer to Durrani's medical licenses being revoked, counsel stated, "[H]e lies about the most important thing in his business life. * * * He can't tell the truth on his medical licensure that without it and if the medical board found out that he was lying on the application, which was renewed every two years, license gone. He is lying on the one thing that lets him make a living."

---

[2] In addition to evidence involving the license revocations, the Durrani collage also contained questions about Durrani's privileges being suspended at hospitals. Defendants, however, do not specifically assert that evidence of the suspensions prejudiced them—they only raise the suspensions in a footnote to point out "[e]xamples of other irrelevant-yet-inflammatory evidence."

{¶65} In *Setters v. Durrani*, 2020-Ohio-6859, 164 N.E.3d 1159 (1st Dist.) ("*Setters I*"), another appeal involving Durrani, we held that evidence involving Durrani's medical license revocations was inadmissible. *Id.* at ¶ 19-21 ("[i]n a medical-malpractice case, evidence that a defendant-doctor's medical license was revoked is by its very nature prejudicial. It predisposes the jury to find that the doctor acted outside acceptable bounds of competence.").

{¶66} Therefore, as we have determined in multiple cases, it was improper for the trial court to admit the Durrani collage into evidence because it referenced the license revocations. Moreover, the trial court improperly permitted the Benders to reference Durrani's license revocation in front of the jury at any point during the proceedings.

### c) Durrani's Pakistani heritage and absence from trial

{¶67} Defendants assert that the Benders "created a prejudicial atmosphere here by emphasizing throughout the whole trial that Dr. Durrani was born and raised in Pakistan, that he was in Pakistan, and that he refused to attend trial," and that the trial court erred by failing to intervene.

{¶68} A trial tainted by passion and prejudice may be grounds for reversal. *Wynn v. Gilbert*, 1st Dist. Hamilton No. C-060457, 2007-Ohio-2798, ¶ 34. It is improper for a trial court to permit a party to make remarks or arguments that are not supported by the evidence and are designed to arouse passion or prejudice, creating a substantial likelihood that the jury may be misled. *Roetenberger v. Christ Hosp. & Anesthesia Assocs. of Cincinnati*, 163 Ohio App.3d 555, 2005-Ohio-5205, 839 N.E.2d 441, ¶ 9 (1st Dist.).

18

{¶69} Defendants point to several instances in which the Benders raised Durrani's absence at trial and presence in Pakistan. But defendants failed to object to four of the examples that they assert caused a prejudicial atmosphere. Their failure to object to those statements waives all but plain error. *State v. Bryant*, 2022-Ohio-4108, 201 N.E.3d 482, ¶ 15 (1st Dist.). And because defendants failed to advance a plain-error argument on appeal, this court will not create one on their behalf. *Crown Asset Mgt., LLC v. Gaynor*, 1st Dist. Hamilton No. C-210157, 2022-Ohio-1468, ¶ 13.

{¶70} Durrani objected to one instance in which the Benders' counsel commented on Durrani's absence from trial and presence in Pakistan. During the Benders' cross-examination of one of Durrani's expert witnesses, the following exchange occurred:

Q: And nobody tried to put you in touch with him in Pakistan, did they?

A. No.

Q. And it was only as of April 2nd that you even realized he was in Pakistan, correct?

A. I don't recall.

{¶71} The trial court overruled defendants' objection to this line of questioning.

{¶72} In *Pierce v. Durrani*, 2015-Ohio-2835, 35 N.E.3d 594, ¶ 19 (1st Dist.), this court rejected Durrani's argument that plaintiffs' comments, which were limited to the fact of Durrani's absence and its impact on the legal proceedings, constituted error. Here, the only comment to which defendants objected was limited to Durrani's presence in Pakistan, which is not inflammatory. It was general information.

{¶73} The trial court did not abuse its discretion by admitting this evidence.

### d) Dr. Zeeshan Tayeb's testimony

**{¶74}** Defendants argue that the trial court improperly admitted testimony that Dr. Shanti, another CAST surgeon, had told Tayeb that Dr. Durrani's "surgical indications" were "significantly more on the aggressive end, if not over." They assert that the trial court improperly admitted this testimony because it was inadmissible under Evid.R. 403(A) as this testimony involved a patient other than Mackenzie and was improper hearsay.

**{¶75}** First, as there have been multiple medical-malpractice trials against Durrani in which plaintiffs have submitted to the jury different versions of Dr. Tayeb's testimony, this court asked the parties to submit the correct version of the testimony that the Bender jury heard. Defendants submitted a transcript of Tayeb's testimony. But after reviewing the exhibit that defendants submitted and comparing it to the portion of the transcript in which the trial court went line by line through Tayeb's testimony and announced which portions the jury would be permitted to hear, this court struck defendants' exhibit because we found that at least part of the exhibit was inaccurate. Accordingly, Tayeb's testimony is not part of our record on appeal. "When the appellant fails to ensure that the necessary exhibits or transcripts are transmitted to the appellate court, this court * * * must presume regularity in the proceedings in the trial court." *State v. Gonzales*, 151 Ohio App.3d 160, 2002-Ohio-4937, 783 N.E.2d 903, ¶ 21 (1st Dist.). Based on defendants' failure to submit an accurate transcript of Tayeb's testimony, we could dispose of the issue by presuming the regularity of the proceedings. But because the testimony to which defendants object is in the portion of the transcript we believe to be the correct version of Tayeb's testimony, we will consider the issue on the merits.

{¶76} Counsel asked Tayeb, "What did Dr. Shanti express to you during your time at CAST concerning Dr. Durrani's surgical indications?" Tayeb answered that Shanti had told him Durrani was "significantly more on the aggressive end * * * if not * * * over aggressive."

{¶77} We disagree with defendants that this testimony gave jurors the impression that Tayeb was discussing Mackenzie's case. Counsel asked Tayeb what Dr. Shanti had told him "during your time at CAST," which clearly involves a general timeframe. And defendants fail to explain how this testimony would leave the impression that the physicians were discussing Mackenzie's care.

{¶78} Moreover, defendants offered no argument, other than a conclusory statement, about why Tayeb's statement was inadmissible hearsay. Dr. Shanti worked at CAST, a defendant in this action. Accordingly, the testimony was admissible under Evid.R. 804(B)(3), which permits hearsay testimony when the statement is contrary to a party's interest. A CAST doctor stating that another CAST doctor was overly aggressive was clearly against CAST's interest.

{¶79} The trial court did not abuse its discretion by permitting Tayeb's testimony.

### 2. Expert Testimony

{¶80} Defendants argue that the trial court abused its discretion by permitting neuroradiologist Ranjiv Saini to testify about matters beyond the scope of his expertise under Evid.R. 702. Specifically, defendants assert that the trial court improperly permitted Saini to testify that the stapling surgery Durrani performed on Mackenzie was experimental, not indicated, and that Durrani recommending and performing the surgery fell below the standard of care.

### a) Expert witnesses must be competent to testify

{¶81} Whether a witness is competent to testify as an expert is left to the trial court's discretion and we will not reverse such a ruling absent an abuse of discretion. *Guiliani v. Shehata*, 2014-Ohio-4240, 19 N.E.3d 971, ¶ 42 (1st Dist.), quoting *Celmer v. Rodgers*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557, ¶ 19.

{¶82} Relevant here, Evid.R. 702 permits a witness to testify as an expert when all of the following apply: (A) the testimony involves matters beyond lay persons' knowledge or experience; (B) the witness has specialized knowledge, skill, experience, training, or education about the subject matter of the testimony; and (C) the testimony is based on reliable scientific, technical, or other specialized information.

{¶83} In medical-malpractice cases, "a witness need not practice in the exact same specialty as that of the defendant-physician; rather, it is the scope of the witness's knowledge and not the artificial classification by title that should govern the threshold question of his qualifications." *Guiliani* at ¶ 43, quoting *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 160, 383 N.E.2d 564 (1978). "[A]n expert need only aid the trier of fact in the search for the truth and need not be the best witness on the subject." *Id.*

### b) The trial court's admitting Saini's testimony was not an abuse of discretion

{¶84} Initially, we note that Saini's training and expertise went beyond a general radiologist's training and expertise. Rather, he is a neuroradiologist. As such, he specializes in issues affecting the spinal cord and brain. While a diagnostic radiologist learns "everything in general," neuroradiologists spend two additional years studying nothing but the brain and spinal cord, and conditions affecting the brain, spinal cord, face, head and neck. Saini spent "additional time just to study

everything to do with imaging of the spinal cord, the head and neck, facial bones, the brain, and I did that for two years, and in addition to my regular diagnostic radiology."

**{¶85}** Defendants, citing this court's opinion in *Adams*, 2022-Ohio-60, 183 N.E.3d 560, at ¶ 57, argue that the trial court abused its discretion by permitting Dr. Saini to testify that Mackenzie's surgery was experimental, was not indicated, and fell below the standard of care. They assert that the *Adams* court limited the topics about which Saini could testify to determining whether imaging indicated that surgery was necessary.

**{¶86}** First, the trial court properly permitted Saini to testify that the surgery was experimental. Counsel for defendants read Saini excerpts from a 2013 medical journal discussing vertebral body stapling in children under the age of ten with idiopathic scoliosis. Saini testified that Mackenzie's surgery happened in 2011 when stapling procedures were "relatively new" and, thus, "still experimental." Saini, who graduated from medical school in 1985, testified that before he reviewed this case, he had never seen a vertebral-stapling procedure, despite his "read[ing] hundreds of thousands, maybe millions of cases -- I have never once seen a case like this. And I've seen cases coming from orthopedic surgeons, from neurosurgeons. * * * I'm licensed in 27 states. First case ever I've seen a [spinal] stapling." And Saini noted that Durrani's post-surgery order for films stated that it was a follow-up for an experimental surgery. Saini was qualified to testify that the procedure was experimental.

**{¶87}** Next, the trial court properly permitted Saini to testify that the surgery was not medically indicated. Defendants assert that a radiologist is unqualified to determine whether a surgery is medically necessary because that is a surgeon's decision. We see no reason to depart from our holding in *Adams*, another case

involving Durrani. There, on appeal, the Durrani parties argued that Saini was qualified to testify about what the diagnostic images showed, but was unqualified to opine about whether the patient's surgery was medically indicated. *Adams* at ¶ 53. This court held that a surgeon's duty to review diagnostic images overlapped that of a radiologist's. *Id.* at ¶ 55. Further, the *Adams* court noted that Saini "worked closely with and trained orthopedic surgeons, used the same diagnostic technology as Durrani, and demonstrated knowledge of the standard used by surgeons in reviewing diagnostic images and arriving at a decision to perform surgery." *Id.* at ¶ 56. Accordingly, the *Adams* court held that the trial court did not abuse its discretion: "a radiologist is equally, if not more, qualified to determine whether an image indicates a need for surgery." *Id.* at ¶ 67. Saini was qualified to testify that Mackenzie's imaging showed that surgery was not medically indicated.

{¶88} Finally, when read in context, Saini's opinion that Durrani deviated from the standard of care involved only whether Durrani should have performed the surgery based on his review of the imaging. Saini's testimony about the standard of care did not involve an opinion about Durrani's performance during surgery. And as discussed above, Saini was qualified to testify that based on his review of the imaging, the surgery never should have happened. Therefore, he was qualified to testify that Durrani's performing the surgery deviated from the standard of care.

{¶89} The trial court did not abuse its discretion by admitting Saini's testimony.

### 3. **Prejudice analysis**

{¶90} As discussed above, the trial court erred by admitting the Durrani collage, references to Durrani's medical licenses being revoked, and references to other

unrelated lawsuits that had been filed against Durrani. But the admission of this evidence is not per se reversible error. Instead, we must consider whether the errors prejudiced defendants. We hold that, had the improperly-admitted evidence that defendants challenge been excised, the result likely would have remained the same. Therefore, the trial court's errors did not prejudice defendants.

### a) Harmless and cumulative-error doctrines

{¶91} R.C. 2309.59 requires a reviewing court to affirm any final judgment where errors in the proceedings do "not affect the substantial rights of the adverse party." Any errors not affecting a party's substantial rights "shall be deemed not prejudicial to the party complaining and shall be disregarded, and the final judgment or decree under review shall be affirmed." *Id.* And Civ.R. 61, which governs the harmless-error doctrine, provides:

> No error in either the admission or the exclusion of evidence * * * is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

{¶92} "An improper evidentiary ruling constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice." *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 35.

{¶93} To determine whether an erroneous ruling affected a party's substantial rights, we must weigh the prejudicial effect of the trial court's errors and determine whether, but for those errors, "the jury * * * would probably have made the same decision." *Id.* at ¶ 35, quoting *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165, 407 N.E.2d 490 (1980), quoting *Hallworth v. Republic Steel Corp.*, 153 Ohio St. 349, 91 N.E.2d 690 (1950), paragraph three of the syllabus. Under Civ.R. 61, if we determine that the jury likely would have made the same decision, the error is harmless. *Potts v. Durrani*, 1st Dist. Hamilton Nos. C-220024 and C-220034, 2023-Ohio-4195, ¶ 17.

{¶94} Moreover, even if individual errors do not prejudice a party, we may reverse a trial court's judgment under the cumulative-error doctrine "if the cumulative effect of multiple errors prevents a fair trial even though each of the individual errors, standing alone, would not constitute grounds for reversal." *Marrs v. Mickel*, 8th Dist. Cuyahoga No. 112221, 2023-Ohio-4528, ¶ 23. This court has employed the cumulative-error doctrine in previous appeals involving Durrani. *E.g.*, *Stephenson v. Durrani*, 2023-Ohio-2500, 221 N.E.3d 1037, ¶ 78 (1st Dist.) ("Given that multiple errors occurred here, we must consider the cumulative effect of these errors."); *Greene v. Durrani*, 1st Dist. Hamilton Nos. C-220023 and C-220037, 2023-Ohio-3069, ¶ 20 (same). But we apply the doctrine with caution because "the cumulative error doctrine is not typically employed in civil cases." *Garry v. Borger*, 1st Dist. Hamilton No. C-220069, 2023-Ohio-905, ¶ 33, quoting *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. Franklin No. 12AP-999, 2013-Ohio-5140, ¶ 124.

### b) **Trial court's evidentiary errors did not prejudice defendants**

{¶95} The two categories in which the trial court improperly admitted evidence were (1) evidence involving other lawsuits against Durrani, and (2) Durrani's

medical license revocations. The defendants also argue that the Durrani collage in general was prejudicial because it was about Durrani's character, rather than his medical competence or the treatment he provided Mackenzie.

{¶96} Defendants argue that admitting evidence involving Durrani's license revocations was not harmless because (1) unlike in *Setters I*, where this court found that the trial court admitting the revocation evidence was harmless error, "the license revocations were mentioned far more than three times in a trial that lasted a week and a half" and the *Setters I* plaintiff did not play the Durrani collage; (2) the Durrani collage made multiple references to the license revocations and included no testimony about any medical care; instead, it was introduced for the purpose of inflaming the jury and smearing Durrani, and (3) substantial evidence did not support the jury's verdict. Defendants do not forward a prejudice analysis involving evidence of other lawsuits individually, but they argue that the cumulative effect of the trial court's errors merits a new trial because the evidence was about Durrani's personal character rather than his medical treatment of Mackenzie.[3]

{¶97} After carefully reviewing the record, we hold that had the trial court precluded admission of the challenged aspects of the Durrani collage and any reference to Durrani's license revocations and the other lawsuits, the jury likely would have reached the same verdict. Therefore, the trial court did not abuse its discretion by denying defendants' motion for a new trial.

---

[3] In their cumulative-error argument, defendants point out that the Durrani collage referred to a criminal assault charge against Durrani that had been dismissed. But defendants failed to develop any argument that this evidence was erroneously admitted; instead, they mention it in a footnote describing the Durrani collage. As defendants did not argue that the trial court's admitting evidence of the dismissed criminal charge was error, we do not consider it in our cumulative-error analysis.

### i. *References to license revocations was comparable to Setters I*

{¶98}  First, the fact that two of the Benders' references to Durrani's license revocations were in the video Durrani collage—rather than a live witness or an attorney referring to the license revocations—does not change the analysis. We look at the entire record and consider the improper references in context of all of the evidence, not just that video collage.

{¶99}  The Benders mentioned Durrani's license revocations four times during the proceedings: once in voir dire, once in opening statements, and twice in the Durrani collage, in two back-to-back questions. (While the Benders' closing argument included a stray comment that referred to Durrani's license, it did not say that his license had been revoked.) In voir dire, when investigating whether potential jurors could be fair, defendants raised the license revocations 17 times. While the license revocations were mentioned many more times than in *Setters I*, only four instances can be attributed to the Benders. Referencing the license revocation four times is not "far more" than in *Setters I*, where the revocations were mentioned three times over the course of the trial.

### ii. *The jury's verdict was split*

{¶100} The Benders' witnesses—Young, Mackenzie, and the Benders' experts—testified that Durrani did not adequately inform Young about the nature and risks of the vertebral-stapling surgery. Defendants' experts, however, testified that Durrani properly informed Young about the nature and risks of the surgery.

{¶101} The jury found in favor of the Benders on some claims. They determined that defendants were negligent in Mackenzie's care and treatment, a reasonable physician would not have performed the surgery, and Durrani had fraudulently

28

misrepresented to the Benders that surgery was medically indicated. But the jury unanimously found in favor of defendants on the Benders' informed-consent claim.

**{¶102}** The differing verdicts, based on conflicting evidence, suggest that the jury carefully examined the evidence presented by both parties and reached the verdict based on that evidence, rather than based on prejudice or passion. *See, e.g., State v. McCoy*, 4th Dist. Pickaway No. 19CA1, 2020-Ohio-1083, ¶ 23 (even if evidence had been admitted improperly, there was "no danger that the jury found appellant guilty of kidnapping upon an improper basis. * * * After the jury reviewed the evidence and counsels' arguments, the jury found appellant not guilty of felonious assault and child endangering, but guilty of kidnapping."); *State v. Kearns*, 2016-Ohio-5941, 71 N.E.3d 681, ¶ 28 (10th Dist.) ("given the jury's different verdicts on Count 1 and Counts 2-5, it is evident the jury carefully considered the element of knowledge and the evidence."); *State v. Smith*, 8th Dist. Cuyahoga No. 112115, 2023-Ohio-4642, ¶ 38 ("As evidenced by the findings of not guilty on several charged offenses, it is clear the jury carefully considered the evidence and the credibility of each witness when rendering its verdict.").

### iii. <u>Substantial competent, credible evidence supported the jury's verdict</u>

**{¶103}** Defendants assert that "the record here does not reflect substantial competent evidence to support the jury's verdict" and instead, the evidence demonstrated that the surgery slowed the progression of Mackenzie's scoliosis and that Mackenzie engages in athletic activities without using strong pain medicine. But defendants ignore the substantial, credible evidence supporting the jury's verdict.

A. <u>Mackenzie's and Young's testimony</u>

**{¶104}** Mackenzie had no scoliosis pain before surgery and her imaging showed a "great result" from her wearing the brace for only a few weeks. Her physicians told her to continue wearing the brace and to follow up. Despite this, in a ten-minute appointment, Durrani advised her to stop wearing the brace and recommended surgery, and then performed vertebral-stapling surgery on 13-year-old Mackenzie.

**{¶105}** Mackenzie testified that she experienced severe post-surgical pain, particularly in her upper right scapula and midback. She told the jury that she experienced pain when breathing while running or doing activities, though no medical professional had told her that her breathing pain was related to the surgery. She had difficulty sitting for long periods of time.

**{¶106}** Mackenzie had wanted to be a nurse. She started nursing school, but after her first clinical, she found she could not physically do the work, such as lifting patients. While she still worked as a nurse technician, she required accommodations to help her. Mackenzie testified that it was "really hard for [her] to get through a workday" because she struggled when she was on her feet a lot.

**{¶107}** Mackenzie testified that the surgery and her continued pain caused her "a lot of anxiety" and that she had seen a counselor once or twice. She experienced mental and physical pain and suffering related to the surgery and had good and bad days. Young stated that Mackenzie saw a psychiatrist, who prescribed her anxiety medication.

**{¶108}** According to Mackenzie, the right side of her body was "pushed backwards and more uneven than the left side" of her body. Imaging after her surgery revealed progression in the curvature of her spine after her surgery, to 51 degrees.

{¶109} Before her surgery, Mackenzie had participated in soccer, basketball, cheerleading, softball, and gymnastics. But after surgery, she struggled with physical activity. She attempted to run cross-country and track in high school, but she "wasn't very good at it and [she] didn't end up finishing with it." Mackenzie testified that she missed being able to enjoy sports and daily activities without pain.

{¶110} As defendants point out, Mackenzie continued to take trips, work out, and tried to run. She did not take pain medication other than Tylenol. And Mackenzie went snowboarding shortly before trial.

{¶111} But Mackenzie also testified that most pain medications "make me nauseous." Young testified that they did not find a pain medication that did not make Mackenzie sick. And Mackenzie testified that she continues to struggle with physical activity and misses being active without pain. She wanted to become a nurse, but one day of clinicals showed her that she could not physically handle doing so.

{¶112} That Mackenzie maintains some of her activities, sometimes runs, and went snowboarding once may have been insignificant to the jury, being that she provided compelling testimony about how her pain—which did not exist before the surgery—has affected her life. She was only 13 years old when Durrani performed the surgery. Her anatomy is permanently altered and she has permanent scarring as a result of the surgery.

## B. Expert testimony

{¶113} Factfinders are in the best position to judge witness credibility and are entitled to believe all, some, or none of the testimony. *State v. Shepard*, 1st Dist. Hamilton No. C-190747, 2021-Ohio-964, ¶ 62. When parties' experts offer competing opinions, the trier of fact is responsible for weighing the testimony and resolving any

conflicting opinions. *Gysegem v. Ohio State Univ. Wexner Med. Ctr.*, 10th Dist. Franklin No. 20AP-477, 2021-Ohio-4496, ¶ 74.

{¶114} Regarding whether the procedure was experimental, the Benders' experts both testified that vertebral-stapling surgeries were experimental procedures. Bender's neuroradiologist testified that in his many years of practice and review of thousands, if not millions, of cases, the first vertebral-stapling surgery he had ever seen was Mackenzie's. On the other hand, Marx, defendants' expert radiologist, testified that he "see[s] these staples as a routine part in my practice" and that stapling surgeries had been around for years. Defendants' expert surgeon, Kaloostian, testified that the vertebral-stapling procedure was not experimental, but did not back that up with any literature, personal experience, or other facts. He also testified that vertebral-stapling surgeries were rare. And Durrani's office wrote on an imaging order after Mackenzie's surgery under clinical history: "F/U FOR EXPERIMENTAL FOR SCOLIOSIS." The Benders provided substantial evidence that the surgery was experimental and because there was conflicting evidence, the jury was entitled to believe the Benders' experts.

{¶115} There was conflicting evidence involving whether the surgery was medically necessary. Marx expressed no opinion on whether Durrani should have performed the surgery. Kaloostian was the only expert to testify that the surgery was medically indicated and performed properly. Some of his testimony bolstered the defendants' case, such as his testimony that vertebral-stapling surgery is appropriate when a patient's spinal curvature rapidly increased, and that Mackenzie's rapid curvature increase was "worrisome." But his testimony was somewhat inconsistent. Although he testified that Durrani's decision to operate on Mackenzie fell within the standard of care, Kaloostian testified that in 2011, the number one option for pediatric

scoliosis patients was medical management, number two was bracing to "see how they do over time," and number three was surgery. When Durrani recommended surgery, Mackenzie had only been wearing the brace for a few weeks and showed a "great result" from its use. Kaloostian also testified that for patients who were not clinically affected by a curvature, he would "highly recommend avoiding surgical intervention which could be fraught with complications." And when asked whether the typical treatment for a pediatric scoliosis patient with a 50-degree or less curve was bracing, Kaloostian responded, "Yeah. Always start with conservative routes, absolutely." Mackenzie's curve was somewhere between 34 and 41 degrees.

{¶116} It is possible that the jury may have given less weight to Kaloostian's testimony involving whether the surgery was medically indicated because he had little experience with pediatric-scoliosis patients, had never performed a vertebral-stapling procedure, and had only seen one vertebral-stapling surgery.

{¶117} The Benders' experts were consistent in their testimony. They agreed with Mackenzie's treating physicians at Shriner's Hospital, who recommended bracing. They testified that surgery was not medically indicated and Durrani never should have recommended or performed surgery on 13-year-old Mackenzie, who had no pain from the scoliosis, had only been wearing a brace for a few weeks when he recommended surgery, and had shown a "great result" from wearing the brace.

{¶118} Moreover, the fact that Mackenzie's medical records from Durrani's office were missing was significant because there were no records that could have shown clinical impressions justifying Durrani's decision to recommend and perform surgery on Mackenzie, rather than having her continue the more conservative route of wearing the brace.

33

{¶119} Regarding the surgery's result, Kaloostian testified that Mackenzie's scoliosis had slowed and the surgery had a good result. But defendants' other expert, Marx, testified that images taken three months after surgery showed that Mackenzie's spine was more curved than before surgery and images from six months after surgery showed an even more severe curve. Marx agreed that Mackenzie's spinal curvature pre-surgery compared to shortly before trial—from a 41-percent to a 51-percent curve—was "not an insignificant progression."

{¶120} When considering all the evidence, excising the challenged aspects of the Durrani collage and all other evidence and references involving Durrani's license revocations and unrelated lawsuits filed against Durrani, the result likely would have been the same. These errors were harmless in light of the remainder of the evidence. And the cumulative effect of these errors did not prevent a fair trial because they did not prejudice defendants.

{¶121} We hold that the trial court's errors did not prejudice defendants, and therefore, the trial court did not abuse its discretion when it denied defendants' motion for a new trial.

**B. THE TRIAL COURT PROPERLY DENIED DEFENDANTS' JNOV MOTION**

{¶122} Defendants' second issue for review asserts that the trial court erred by denying their motion for JNOV, arguing that the trial court erroneously awarded the Benders medical expenses.

{¶123} Civ.R. 50 governs JNOV motions. *Adams*, 2022-Ohio-60, 183 N.E.3d 560, at ¶ 19. A JNOV motion tests the legal sufficiency of the evidence. *McCann v. Durrani*, 2023-Ohio-3953, 227 N.E.3d 471, ¶ 38 (1st Dist.), *discretionary appeal not allowed*, 2024-Ohio-1030, 2024 Ohio LEXIS 613 (Mar. 20, 2024), quoting *Setters I*,

2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 28. Because sufficiency of the evidence is a legal issue, this court reviews a trial court's ruling on a JNOV motion de novo. *Hounchell*, 1st Dist. Hamilton No. C-220021, 2023-Ohio-2501, at ¶ 30. We construe the evidence in the light most favorable to the nonmoving party and only reverse if reasonable minds could only find in favor of the moving party. *Id.*

### 1) The trial court properly awarded past medical expenses

{¶124} Defendants argue that because the Benders' insurer, Humana, paid all of Mackenzie's past medical expenses, the Benders lacked standing to seek past medical damages and Humana was the only real party in interest. Thus, defendants argue that they are entitled to a judgment as a matter of law because the Benders failed to name Humana as a party.

### a) Standing

{¶125} In *McCann*, the plaintiff's medical expenses were paid by her insurer. *McCann* at ¶ 17. Like here, defendants argued that the plaintiff lacked standing to seek damages for past medical expenses because they were fully paid by her insurers. *Id.* at ¶ 15.

{¶126} The *McCann* court explained that while standing and real party in interest were related concepts, "the interests being served and consequences for their absences are distinct." *Id.* at ¶ 19. Standing is a prerequisite to invoking a court's jurisdiction and must be determined when the action is filed. *Id.* at ¶ 20. "Standing refers to whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Id.*, quoting *Davet v. Sheehan*, 8th Dist. Cuyahoga No. 101452, 2014-Ohio-5694, ¶ 22.

{¶127} Importantly, a party's standing to bring an action involves the entire action, not individual claims. *Id*. at ¶ 22.

{¶128} The Benders' complaint sought damages for medical expenses and for Mackenzie's pain and suffering. Defendants do not argue that the Benders lack standing to seek damages for future medical expenses or pain and suffering. And because standing involves the entire action, rather than individual claims, whether an insurer paid none, some, or all of Mackenzie's medical expenses does not affect the Benders' standing to bring the action. Thus, we hold that the Benders had standing to sue defendants.

### b) Real party in interest

{¶129} Actions must be prosecuted by "the real party in interest." Civ.R. 17(A). "The purpose behind the real party in interest rule is * * * to enable the defendant to avail himself of evidence and defenses that the defendant has against the real party in interest, and to assure him finality of the judgment, and that he will be protected against another suit brought by the real party at interest on the same matter." *Setters I*, 2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 54, quoting *Shealy v. Campbell*, 20 Ohio St.3d 23, 25, 485 N.E.2d 701 (1985). Thus, the real-party-in-interest rule concerns proper party joinder. *McCann*, 2023-Ohio-3953, 227 N.E.3d 471, at ¶ 21. And under Civ.R. 19(A), a person who "has an interest relating to the subject of the action as an assignor, assignee, subrogor, or subrogee" is a necessary party. *Id*.

{¶130} Defendants, citing *Shealy*, argue that where an insurer fully pays an insured's loss, "the insured no longer has a right of action against the wrongdoer." If Humana had paid all of Mackenzie's damages and had not waived its subrogation

rights, we could agree with defendants that the Benders were not the real parties in interest. But that is not the case.

{¶131} The *McCann* court held that "in a case where the insurer only paid part of a plaintiff's damages, the plaintiff has standing and is also a real party in interest along with her insurer." *McCann* at ¶ 27. Humana did not pay all of Mackenzie's damages. Mackenzie's medical bills totaled $119,684.29, but Humana paid $57,837.21. Accordingly, under *McCann*, because Humana did not pay all of the Benders' damages, the Benders are the real parties in interest.

{¶132} Moreover, the Benders submitted an affidavit showing that they had settled with Humana and that Humana had agreed to "collect reimbursement of its lien from Ms. Bender's verdict." Accordingly, Humana's only avenue for collecting the amount it paid for Mackenzie's medical expenses is by collecting from the Benders. Thus, the Benders unquestionably are the real parties in interest. *See McCann* at ¶ 32 ("Medicare and Medicaid were the real parties in interest as to McCann's past medical expenses at the time of filing. However, following the trial, McCann settled with Medicare and Medicaid. Consequently, McCann became the sole real party in interest as to those past medical expenses.").

{¶133} The agreement between the Benders and Humana protects defendants' interest. Because Humana may collect only from the Benders' verdict against defendants, they will not be exposed to double liability.

{¶134} The Benders had standing to bring their claims and were the real parties in interest to recover past medical expenses.

### 2) **Mackenzie's future medical expenses were not speculative**

{¶135} Defendants next argue that Mackenzie's future medical expenses were speculative and not supported with specific evidence. Defendants assert that, even if the expert testimony were sufficient to reasonably establish the amount Mackenzie stood to incur in the future, the testimony did not support the jury's "arbitrary" $10,000 award.

{¶136} Future damages are limited to losses that the plaintiff is reasonably certain to incur from the injuries. *Setters I*, 2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 40, citing *Galayda v. Lake Hosp. Sys., Inc.*, 71 Ohio St.3d 421, 425, 644 N.E.2d 298 (1994). A plaintiff's claim for future medical expenses must be supported by evidence that reasonably establishes the amount to be incurred in the future. *Id.*, citing *Stone v. Patarini*, 9th Dist. Lorain No. 98CA007242, 2000 Ohio App. LEXIS 2709, 3 (June 21, 2000). "[T]he jury cannot be allowed to speculate or guess in making allowance for future medical expenses, and, to this end, there must be some data furnished to the jury upon which to predicate an estimate of future costs." (Internal quotations omitted.) *Id.*, quoting *Waller v. Phipps*, 1st Dist. Hamilton No. C-000758, 2001 Ohio App. LEXIS 4119, 4 (Sept. 14, 2001).

{¶137} In *Waller*, this court analyzed whether the defendants were entitled to a directed verdict on the issue of future medical expenses. *Id.* at 10. Waller's surgeon testified that the plaintiff would continue to experience pain in the future. *Id.* But no expert testified about the extent or the cost of Waller's future medical treatment. *Id.* at 12-13. This court reversed Waller's future-medical-expenses award because she failed to present expert testimony on the nature and extent of her future medical treatment. *Id.* at 14.

{¶138} This case is distinguishable from *Waller*. Mortimer testified that Mackenzie would require spinal fusion from T4 or 5 to L1 or 2 in the future due to the documented progression of her scoliosis and that Mackenzie would not have required any surgery had she continued treatment using the brace. He testified that this surgery would cost between $150,000 to $200,000, consisting of the inpatient portion of the procedure, outpatient follow-up, and physical therapy.

{¶139} That the jury decided to award the Benders significantly less than they requested does not render Mortimer's testimony involving future medical expenses speculative. The jury simply made a choice to award less and we will not speculate about why the jury made that choice.

{¶140} We overrule defendants' first assignment of error.

## SECOND ASSIGNMENT OF ERROR

{¶141} Defendants' second assignment of error argues that the trial court improperly awarded the Benders prejudgment interest. They assert that the trial court erred because (1) the Benders withdrew their motion for prejudgment interest, and (2) the Benders did not meet the statutory requirements.

### A. THE BENDERS REINSTATED THEIR PREJUDGMENT-INTEREST MOTION

{¶142} In March 2021, ten days after the trial court denied their motion for prejudgment interest, the Benders filed a notice withdrawing that motion. Minutes later, the Benders moved to set aside the trial court's decision denying their prejudgment-interest motion. In April 2021, the trial court vacated its decision denying the Benders' prejudgment-interest motion. Neither party filed anything further before January 2022, when the trial court held a prejudgment-interest evidentiary hearing. The following conversation occurred at that hearing:

39

TRIAL COURT: I wanted to straighten something out. At one time [the Benders' counsel] filed a motion to withdraw and a motion for prejudgment interest. Does the record reflect that --

BENDERS' COUNSEL: The Court of Appeals ruled that you can't dismiss those motions.

TRIAL COURT: You can't dismiss that motion?

BENDERS' COUNSEL: Right. Once you make the motion, you've made the motion. It can't be withdrawn.

TRIAL COURT: Is that true in the *Nichols* case?

DEFENDANTS' COUNSEL: Yes.

BENDER'S COUNSEL: In all of the cases. The Court of Appeals put it all back before the Court.

* * *

DEFENDANTS' COUNSEL: [T]he plaintiffs completely withdrew their motions for prejudgment interest. And then [the previous trial judge] holds hearings and decides prejudgment interest in those cases after the plaintiffs had withdrawn them.

BENDERS' COUNSEL: Because we're not allowed to withdraw them. So it was a nullity. So we never withdrew them. And it doesn't really matter because they're before the court on their merits.

{¶143} This court confronted withdrawn motions for prejudgment interest in *McCann*, 2023-Ohio-3953, 227 N.E.3d 471. There, the trial court entered judgment in the plaintiff's favor, but left several issues undecided, including a prejudgment-interest motion. *Id.* at ¶ 44. The plaintiff withdrew her prejudgment-interest motion

to create a final, appealable order. *Id.* Defendants filed a notice of appeal a few days later, but that appeal was dismissed for lack of jurisdiction. *Id.* at ¶ 45. This court's dismissal entry treated the withdrawal of the prejudgment-interest motion as a nullity. *Id.* at ¶ 46. The next month, this court published an opinion providing a different analysis of the effect of a party withdrawing a prejudgment-interest motion. *Nichols*, 1st Dist. Hamilton No. C-210224, 2021-Ohio-2973. In *Nichols*, we ruled that when a prejudgment-interest motion is pending, a judgment is not final until the trial court enters an order resolving the post-judgment motion. *Id.* at ¶ 4.

{¶144} The trial court in *McCann* determined that McCann's withdrawal of her prejudgment-interest motion was a nullity and reinstated the motion. Based on the intervening *Nichols* opinion, the *McCann* court held that the trial court erred by reinstating the prejudgment-interest motion. *McCann*, 2023-Ohio-3953, 227 N.E.3d 471, at ¶ 52.

{¶145} But the facts in this case differ from those in *McCann*. First, the Benders' notice of withdrawal of their prejudgment-interest motion occurred after the trial court had already denied both their motion for prejudgment interest and their motion for reconsideration of that decision. Thus, there was nothing to withdraw because the motion had already been decided. *See Griffin v. Kelly*, 162 F.R.D. 353, 354 (D.Kan.1995) ("The motion cannot be withdrawn at this time since it has already been properly ruled on by the court."); *Margetis v. Furgeson*, 666 F.Appx. 328, 332 (5th Cir.2016) (stating that a motion for sanctions must be served before the court rules on the alleged sanctionable filing because "[a]t that point, there is nothing left for the opposing party to withdraw or correct."); *In re Walker*, 532 F.3d 1304, 1309 (11th

41

Cir.2008) ("if the court has already denied the motion; it is too late for the offending party to withdraw the challenged contention.").

**{¶146}** Second, just minutes after the Benders filed their notice withdrawing their motion for prejudgment interest, the Benders moved to set aside the decision denying their prejudgment-interest motion. To the extent that the Benders were able to withdraw a motion after the trial court had already disposed of that motion, their filing a motion to set aside the ruling revived the issue. Defendants did not respond to the Benders' motion to set aside the decision denying prejudgment interest. The trial court vacated its decision denying the motion for prejudgment interest, thus granting the Benders' motion to set aside. Neither party filed anything further involving prejudgment interest until more than nine months later, after the trial court held another prejudgment-interest hearing in January 2022.

**{¶147}** Third, defendants participated in the January 2022 hearing. They pointed out that despite the Benders (and plaintiffs in other cases) withdrawing their motions for prejudgment interest, the trial court nevertheless held hearings and rendered decisions on prejudgment interest. But at no time did defendants object to the trial court holding the January 2022 evidentiary hearing on prejudgment interest. "[I]ssues not raised in the trial court may not be raised for the first time on appeal because such issues are deemed waived." *State v. Walker*, 2017-Ohio-9255, 103 N.E.3d 325, ¶ 26 (1st Dist.), quoting *City of Columbus v. Ridley*, 2015-Ohio-4968, 50 N.E.3d 934, ¶ 28 (10th Dist.); *see State ex rel. Zollner v. Indus. Comm. of Ohio*, 66 Ohio St.3d 276, 278, 611 N.E.2d 830 (1993) ("A party who fails to raise an argument in the court below waives his or her right to raise it here."). Here, defendants failed to object to the trial court's holding a prejudgment-interest evidentiary hearing and

failed to specifically argue that the trial court should not have considered arguments on prejudgment interest because the Benders had withdrawn their motion. While defendants recited the procedural posture for the court, they participated in the hearing without objection.

{¶148} The trial court did not err by awarding prejudgment interest to the Benders. They filed their motion to set aside the decision denying their prejudgment-interest motion after they had filed a notice withdrawing their motion, reviving the prejudgment-interest issue. Defendants did not respond to their motion to set aside and did not object to the trial court holding a prejudgment-interest hearing. Thus, the trial court did not err by considering the Benders' prejudgment-interest request.

## B. THE TRIAL COURT'S BAD-FAITH DETERMINATION WAS NOT AN ABUSE OF DISCRETION

{¶149} Defendants next assert that the Benders cannot show that defendants did not act in good faith.

### 1. Parties are required to act in good faith

{¶150} A trial court "shall" award prejudgment interest when it determines that R.C. 1343.03(C)'s requirements have been met: (1) the party seeking prejudgment interest must petition the court; and the trial court (2) held a hearing on the motion; (3) found that the nonmoving party failed to make a good-faith effort to settle; and (4) found that the moving party made a good-faith effort to settle the case. *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 658, 635 N.E.2d 331 (1994).

{¶151} Although a prejudgment-interest award is not discretionary if the trial court determines that the moving party met R.C. 1343.03(C)'s four requirements, the trial court has discretion to determine whether a party acted in good faith. *Id.* And its determination regarding whether a party acted in good faith is reviewed for an abuse

of discretion. *Id.* "A trial court has wide discretion in deciding whether to award prejudgment interest based upon the evidence of the parties' settlement efforts." *Jeffrey v. Marietta Mem. Hosp.*, 10th Dist. Franklin Nos. 11AP-492 and 11AP-502, 2013-Ohio-1055, ¶ 80. If the record contains competent, credible evidence supporting the trial court's decision, there is no abuse of discretion. *Patterson v. Colla*, 7th Dist. Mahoning No. 03 MA 18, 2004-Ohio-3033, ¶ 44.

{¶152} The party seeking prejudgment interest bears the burden of demonstrating its entitlement to the award. *Moskovitz* at 659. To determine whether a party acted in good faith, courts must focus on the parties' pretrial settlement efforts. *Id.* at 661.

{¶153} The Supreme Court of Ohio has defined good faith in the negative. A party did not fail to make a good-faith pretrial effort to settle when it "(1) fully cooperated in discovery proceedings, (2) rationally evaluated [its] risks and potential liability, (3) [did] not attempt[] to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party." *Id.* at 659, quoting *Kalain v. Smith*, 25 Ohio St.3d 157, 495 N.E.2d 572 (1986), syllabus. Moreover, when "a party has a good faith, objectively reasonable belief that he has no liability, [it] need not make a monetary settlement offer." *Id.* Courts should strictly construe when a party does not need to make a settlement offer. *Id.*

### 2. The trial court did not abuse its discretion in finding that defendants failed to act in good faith

{¶154} Defendants assert that the Benders failed to show that they lacked a reasonable legal justification for disputing liability. They further argue that the Benders failed to present evidence of a written reasonable offer to settle the case.

44

{¶155} Defendants point out that the Benders' own expert, Dr. Bloomfield, determined that Durrani had met the standard of care. They further argue that, though evidence was presented to show how many other plaintiffs won their cases against Durrani with verdicts exceeding a million dollars, the trial court ignored Durrani's wins, that plaintiffs have received "wildly varied verdicts," and that there were key issues pending on appeal, particularly issues regarding the "Durrani collage."

{¶156} Defendants further argue that the Benders failed to show that they also made a good-faith effort to settle the case. Although defendants concede that the Benders made a one-million-dollar demand on the first day of the trial, they argue that "rote restatement" of the same demand as previous plaintiffs is not a good-faith effort to settle the case.

{¶157} The purposes of R.C. 1343.03(C) are " 'to promote settlement efforts, to prevent parties who have engaged in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting.' " *Moskovitz*, 69 Ohio St.3d at 658, 635 N.E.2d 331, quoting *Kalain* at 159.

{¶158} In *Burton v. Slusher*, 7th Dist. Mahoning No. 07-MA-143, 2008-Ohio-4812, ¶ 85-93, another medical-malpractice case, the Seventh District held that an R.C. 1343.03(C) prejudgment-interest award against a physician was not an abuse of discretion because (1) he made no settlement offer before trial, (2) his in-trial offers were not the type of offers contemplated by R.C. 1343.03(C), and (3) the offers made were much less than the verdict that was returned against him, where the jury awarded appellee $750,000 and the physician's pretrial settlement offer was $0.

{¶159} Defendants made no settlement offers before the jury rendered its verdict. And the jury returned a $568,415.07 award, which is far greater than defendants' offer, which did not exist. Moreover, as described above, defendants' expert testified that conservative treatment is the best course of action.

{¶160} While another court may have found that defendants acted in good faith, that is not enough for us to find an abuse of discretion. As the Supreme Court of Ohio instructs, "[a]n abuse of discretion involves far more than a difference in * * * opinion * * *. The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations." *State v. Jenkins*, 15 Ohio St.3d 164, 222, 473 N.E.2d 264 (1984), quoting *Spalding v. Spalding*, 355 Mich. 382, 384, 94 N.W.2d 810 (1959). There was some competent, credible evidence supporting the trial court's bad-faith finding. Accordingly, we hold that the trial court's prejudgment-interest award was not arbitrary, unreasonable, or unconscionable, and we overrule defendant's second assignment of error.

## THIRD ASSIGNMENT OF ERROR

{¶161} Defendants argue in their third assignment of error that Ohio law entitles defendants to a credit against a plaintiff's judgment when the plaintiff settles with other defendants for the same injury.

{¶162} Generally, a nonsettling party is entitled to a setoff under R.C. 2307.28 when a settling defendant is liable for any of the plaintiff's damages. *Potts*, 1st Dist. Hamilton Nos. C-220024 and C-220034, 2023-Ohio-4195, at ¶ 46; R.C. 2307.28; *Setters I*, 2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 62. Once a trial court determines that a setoff is appropriate, it looks to the settlement agreements between the plaintiffs and the settling defendants to determine the proper credit. *Id*. at ¶ 47.

{¶163} Defendants assert that they are entitled to a credit against the Benders' judgment under R.C. 2307.28(A) because the Benders settled with West Chester Hospital and UC Health, and the complaint against those entities was for the same injury alleged to have been caused by Durrani.

{¶164} But the verdict against defendants included both nonintentional and intentional torts. And "an intentional tortfeasor is not entitled to a setoff." *Adams*, 2022-Ohio-60, 183 N.E.3d 560, at ¶ 78. Indeed, R.C. 2307.25(A) explicitly states that intentional tortfeasors have no right of contribution.

{¶165} Defendants, however, assert that they are entitled to a new trial on this issue because they sought a jury instruction apportioning damages for each theory of liability and the trial court declined their request. They argue that had the jury been instructed to assign a percentage of the damages to each cause of action, the trial court would have been able to distinguish between damages going toward the intentional tort versus the unintentional tort.

{¶166} But defendants do not assign as error the trial court's failure to include apportionment in the jury instructions. Their failure to assign as error the trial court's refusal to provide the jury their requested apportionment instruction renders us unable to provide their requested relief.

{¶167} We hold that because the jury ruled that defendants committed an intentional tort, defendants are not entitled to credits or setoffs against the verdict. Therefore, we overrule defendants' third assignment of error.

### III.  CONCLUSION

{¶168} For the foregoing reasons, we overrule defendants' assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**BERGERON, J.,** concurs.
**ZAYAS, P.J.**, concurs in judgment only.

Please note:

The court has recorded its entry on the date of the release of this opinion.