[Cite as *In re K.P.*, 2019-Ohio-2045.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re K.P.                                            Court of Appeals No. L-18-1196

                                                      Trial Court No. JC 16253300

                                                      **DECISION AND JUDGMENT**

                                                      Decided:  May 24, 2019

* * * * *

Robert P. Soto, for appellant.

David T. Rudebock, for appellee.

* * * * *

**SINGER, J.**

{¶ 1} This is an appeal from the August 16, 2018 judgment of the Lucas County

Court of Common Pleas, Juvenile Division.  For the reasons that follow, we affirm the

judgment.

**{¶ 2}** Appellant sets forth three assignments of error:

I. The trial court's decision was against the manifest weight of the evidence.

II. The trial court failed to consider required factors in determining best interest of the child.

III. The trial court applied the incorrect standard of review in reviewing the magistrate's decision.

## Background

**{¶ 3}** Appellant is the mother of K.P., who was born in March 2011. At that time, mother and father were in a relationship and lived together, but were not married.

**{¶ 4}** On October 10, 2014, appellee, Lucas County Children Services ("LCCS"), received a referral that father was shooting up heroin and overdosed while at home with K.P.; mother was at work. A 911 call was made, Emergency Medical Service ("EMS") arrived at the home and found father unresponsive. K.P. was transported to the hospital with father. Upon investigation, LCCS learned father totaled mother's car, father admitted he had a problem with substances and father's employer was sending him to an in-patient program for two months. Mother and K.P. moved out of father's home, and LCCS believed mother ended her relationship with father; LCCS closed the case.

**{¶ 5}** On February 2, 2016, LCCS received a referral that on January 29, 2016, police found father's running vehicle at a stop sign with father snoring and unresponsive, and K.P. crying in the back seat. Narcan was administered to father and he was

2.

transported to the hospital. Mother was contacted and picked up K.P. Mother informed LCCS this was the fourth time father had been revived from overdosing since October 2015. Father was charged with various crimes. Mother told LCCS she did not know that father was using substances, and she moved back in with father after the previous LCCS case was closed because she thought father was clean. Mother admitted she has a prescription for Percocet, which she keeps in her bra at night so father will not steal it. Mother also admitted father has been verbally abusive towards her, has taken her phone and has stolen her keys and money. On February 5, 2016, LCCS requested that mother "drop urine," but mother was unable to leave a screen.[1]

### First Interim Temporary Custody Award

{¶ 6} On February 8, 2016, LCCS filed a complaint in dependency and neglect regarding K.P. A shelter care hearing was held, and on February 9, 2016, the magistrate issued a decision finding there was probable cause to believe placement in shelter care was required in order to protect K.P. from immediate or threatened physical or emotional harm. Interim temporary custody of K.P. was awarded to mother's friend ("the friend"), who had known K.P. since birth.

[1]The foregoing facts were set forth in the findings of fact attached to the April 29, 2016, magistrate's decision.

3.

**Temporary Custody Award**

{¶ 7} On April 19, 2016, LCCS filed an amended complaint in dependency and neglect, and another shelter care hearing was held before a magistrate. On April 29, 2016, the magistrate issued a decision finding K.P. was a dependent and neglected child and it was in her best interest for temporary custody to be awarded to the friend. On May 20, 2016, the court issued a judgment entry adopting the magistrate's decision.

**Legal Custody Award**

{¶ 8} On November 2, 2016, LCCS filed a motion to change placement of K.P. to mother, and to terminate temporary custody of the friend. On November 18, 2016, mother filed a motion for reunification and legal custody. A hearing was held on February 2, 2017, and on February 3, 2017, the magistrate issued a decision to place K.P. in mother's care with protective supervision. On February 9, 2017, the court approved the magistrate's decision.

**Second Interim Temporary Custody Award**

{¶ 9} On June 14, 2017, LCCS filed a motion to change disposition and request for emergency hearing. LCCS alleged the following. Mother lost her job because she swore at someone. On May 19, 2017, mother was involved in a car accident after she took K.P. to school. Eyewitnesses reported mother was swerving prior to crashing her car. Mother was not wearing a seat belt and did not have insurance at the time of the accident. Mother was severely injured in the accident and required hospitalization and medical treatment. After mother was discharged from the hospital, she went to father's

4.

house.  Mother secured another job.  Mother reported father was in and out of the hospital due to non-prescription drug related health issues.  LCCS received reports that mother had sent K.P. to school in dirty clothes, mother would not look in K.P.'s school bag for homework or schoolwork, and mother does not follow through with school requests.  In addition, mother did not take K.P. to counseling, and K.P. only went to counseling when relatives took her.  K.P. reported mother would not feed her at times.  LCCS believed it was in K.P.'s best interest for her to be placed with uncle and his wife.

{¶ 10} Also on June 14, 2017, a hearing was held and the magistrate issued a finding there was probable cause to believe placement in shelter care was required in order to protect K.P. from immediate or threatened physical or emotional harm.  Interim temporary custody of K.P. was awarded to uncle and his wife.  On July 26, 2017, the court issued a judgment approving custody and placement of K.P.

### Third Interim Temporary Custody Award

{¶ 11} On August 1, 2017, LCCS filed a second motion to change disposition and request for emergency hearing because uncle and his wife requested K.P.'s immediate removal from their home due to mother's continued disrespect and threats against them.

{¶ 12} In the motion, LCCS alleged the following background facts.  K.P. was removed from the parents' custody and home after father overdosed with K.P. in his care. Mother had allowed father to care for K.P. despite knowing he was using heroin and had overdosed before.  Case plan services were offered to mother including a diagnostic assessment, counseling, parenting and domestic violence services; mother completed all

5.

of her services. On February 2, 2017, mother was awarded legal custody of K.P., with protective supervision. On June 14, 2017, interim temporary custody of K.P. was awarded to uncle and his wife due to the following concerns: father had overdosed, mother had attempted to run over father with a car on Easter, mother had a car accident, and father made a 911 report that mother was stalking him.

{¶ 13} LCCS further alleged father had completed inpatient and outpatient treatment, but there were concerns he was still abusing substances. Father left a voicemail message for the caseworker in July 2017, in which he sounded under the influence. In addition, father refused to meet with the caseworker or K.P. at the agency.

{¶ 14} A hearing was held on August 1, 2017, and the magistrate issued an interim order finding there was probable cause to believe placement in shelter care was required in order to protect K.P. from immediate or threatened physical or emotional harm. The magistrate ordered interim temporary custody be awarded to LCCS, and K.P. was placed with the friend. The magistrate further ordered "mother shall not call or contact in any manner the placement person or placement home." On August 18, 2017, the court issued a judgment entry adopting the magistrate's decision.

## Latest Custody Award

{¶ 15} On January 23, 2018, mother filed a motion for reunification and legal custody. On January 25, 2018, LCCS filed a motion to transfer custody and determine visitation and support. A hearing was held on March 21 and April 11, 2018. Mother participated in the hearings, father did not.

6.

{¶ 16} On April 17, 2018, the magistrate issued a decision finding K.P. should be placed in the legal custody of the friend and her partner, and mother should be awarded supervised parenting time twice a month for six hours. The court approved the magistrate's decision on April 18, 2018. Mother filed an objection and supplemental objection to the magistrate's decision. On August 16, 2018, the juvenile court issued a judgment denying mother's objections. Mother appealed. Father did not appeal and is not a party to this appeal.

### The March 21 and April 11, 2018 Hearing

{¶ 17} LCCS called three witnesses, including the caseworker, to testify at the March 21, 2018 hearing. Mother testified and called her aunt to testify on April 11, 2018. Numerous exhibits were admitted into evidence at the hearing including the March 1, 2018 report and recommendation of the court appointed special advocate/guardian ad litem ("CASA/GAL"), where the CASA/GAL opined it was in K.P.'s best interest for the friend and her partner to receive legal custody, and mother's visitation with K.P should be at the discretion of the friend and her partner. The relevant witness testimony is summarized below.

### Caseworker

{¶ 18} Shawn Myers, the ongoing caseworker, testified to the following. She became involved with the family in February 2016. LCCS received a referral that father overdosed on heroin while in the car with K.P., who was four years old. When police

arrived, K.P. was in the back of the car crying and father was unconscious. Mother was contacted and picked up K.P.

{¶ 19} The next day at a staffing, a discussion was held with mother about her allowing father to care for K.P. while knowing father was using illegal drugs and having problems in the home. K.P. was adjudicated to be a dependent child, a case plan was developed and K.P. was moved to the friend's home.

{¶ 20} Myers recounted services offered to father including counseling, domestic violence classes and intensive outpatient treatment. Father did not complete domestic violence classes and relapsed three times, drinking alcohol and using illegal drugs.

{¶ 21} Myers described the services offered to mother as domestic violence victims classes, parent-child interactive therapy and a dual diagnostic assessment. Mother completed those services. On February 2, 2017, mother was given custody of K.P., with protective supervision and the mandates that K.P. was to attend counseling and was not to be left alone with father. After K.P. left the friend's house, mother cut off the friend and would not let K.P. see the friend. Mother arranged with K.P.'s uncle and his wife to watch K.P. after school, but eventually K.P. was at uncle's home five days a week. Uncle started to complain about mother's oversleeping and not being on time. K.P. said she did not want to go see mother because all mother does is sleep and smoke, and mother is always sick.

{¶ 22} On February 8, 2017, the friend went to the police department to report that father had called her phone seeking to buy Percocets; a recording of the call was made.

8.

The friend believed father thought he was calling another woman. On March 30, 2017, there was a report that father overdosed on heroin and was given Narcan.

{¶ 23} In April 2017, Myers received several police reports regarding mother and father. On April 16, 2017, father reported telecommunications harassment by mother for calling him a hundred times a day for the past three months. Later that day, father reported he was hit by mother's car in a parking lot; mother denied hitting father. On April 17, 2017, father reported mother was stalking him. On April 21, 2017, it was reported that father overdosed with K.P. in the home, but mother denied K.P. was there. In a 911 report, it stated mother found father unconscious, EMS was called and K.P. was there. Myers talked to K.P. and K.P. would only say father was sleeping. After K.P. was removed from mother's care, K.P. told Myers that mother was lying and K.P. was in the apartment, in the closet, when the ambulance came to get father. K.P. said mother told her not to come out of the closet or father would be mad, so K.P. spent the night in the closet and wore father's shirt as a nightgown.

{¶ 24} Myers was prepared to file a show cause motion, but before she did so, mother was in a car accident on May 19, 2017. After mother dropped K.P. off at school, mother was driving on the expressway, with no insurance and no seat belt, when she blacked out and crashed. Myers said it was very serious and she thought mother was placed into an induced coma. When mother awoke, she asked for more drugs for the pain, but did not inquire about K.P. Mother was discharged from the hospital and went to father's home to recuperate. Uncle and his wife watched K.P. during mother's recovery.

9.

{¶ 25} On May 31, 2017, Myers and the CASA had a home visit with mother at father's home. Father was present at the visit and at first he was pleasant, but when Myers tried to discuss some concerns which had occurred prior to the accident, and that a show cause motion was going to be filed, father became irate, charged at Myers and swore at her. Myers and the CASA left the home, and that was Myers' last home visit with father. Thereafter, Myers spoke with father on the phone, but father did not feel he had a problem. Myers also received voicemails from father; he was intoxicated and clearly still using. Myers opined it would not be in K.P.'s best interest to have unsupervised visits or be reunited with father.

{¶ 26} Myers noted mother has made it difficult for K.P. in her placements because mother texted, harassed, made comments, was "on Facebook bashing on them * * * [and] prevented her from going on vacations and doing fun activities. It's usually mom first [K.P.] second." K.P. had to be removed from uncle's home due to mother's harassment.

{¶ 27} In October 2017, mother was referred to Harbor Behavioral Health Care for an assessment, which she completed on October 16, 2017. It was recommended that mother engage in mental health therapy to help process her recent trauma from the accident and reduce her anxiety. On January 26, 2018, mother started counseling, and continues to go once a month. Myers observed mother went through the motions of attending and completing services, as mother does not see the benefit in receiving

10.

services and does not feel she needs counseling.  With respect to parent-child interactive therapy, mother said she was not happy doing the therapy as she thought it was stupid.

{¶ 28} K.P. told Myers that she, K.P., wanted to stay with the friend and visit with mother, but K.P. did not want to go home.  Myers stated "she is 6 years old and you would think that she would be too young to know what she wants, but she's experienced so much trauma even before we were involved with mom and dad fighting and domestic violence and the drugs and she has had enough."  Myers observed if the friend had legal custody of K.P., the friend would follow court orders and allow K.P. to have contact with family, but mother would not do the same.  Myers opined she did not feel mother could offer K.P. a safe, stable and permanent home, and it was in K.P.'s best interest for the friend and her partner to have legal custody.

**The Friend**

{¶ 29} The friend testified as follows.  She has known K.P. her entire life, and at one point, mother and K.P. lived with the friend.  The friend and mother were good friends until mother's life choices changed the friendship.  After LCCS became involved with mother, the friend was willing to take temporary custody of K.P.  There were no problems with K.P. when she was placed in the friend's home, and initially, there were no issues with mother. However, after a few months, problems started when mother found out the friend was reporting information to LCCS about mother's visits with K.P. K.P. stayed at the friend's home for a year.  Then, K.P. was placed with mother.  LCCS told the friend to keep her distance from mother and K.P., and the friend did so.

**{¶ 30}** In August 2017, K.P. was again placed with the friend and has been living there ever since. K.P. gets along with the friend's daughter, who is three years older than K.P. K.P. and the friend's daughter go to the same school, and K.P. does very well in school. K.P. visits with mother one time a week at grandmother's home. If awarded legal custody of K.P., the friend would follow court orders and facilitate visitations with K.P. and K.P.'s family. The friend would offer K.P. a safe, stable and permanent home. K.P. has told the friend on many occasions that K.P. wishes to stay with the friend.

**Uncle**

**{¶ 31}** K.P.'s uncle testified as follows. He and his wife agreed to take temporary custody of K.P., with the intention and hope that mother would be able to get K.P. back. It was very fun when K.P. was living with uncle.

**{¶ 32}** In early 2017, when K.P. was given back to mother, K.P. was with uncle and his wife about five days a week because mother worked nights. During that time, there were a few problems including K.P. coming to uncle's home very hungry, some issues with clothes, and mother was not timely picking up K.P.

**{¶ 33}** After mother's accident, uncle went to mother's home which was "very filthy and gross. Cat litter piled up three times as high as the litter box. It was all over the floor. There was a dog that looked like it was near it's [sic] death bed, which come to find out has passed away." Uncle took temporary custody of K.P. and that is when "everything came apart." There was a lot of aggression from mother and accusations that uncle was trying to sabotage mother's chance of getting K.P. back. K.P. talked with

mother on the phone, but they did not visit right away because mother was "beat up pretty bad." When uncle, his family and K.P. were on an outing, a giant argument with mother occurred over the phone. Uncle had problems with mother and father. Uncle thought it was in K.P.'s best interest at this time to be with the friend, as mother does not put K.P. first.

## Mother's Aunt

{¶ 34} Mother's aunt testified as follows. She lives with grandmother, and became an approved supervisor for visits between mother and K.P. shortly after mother's accident. Originally visits were once a week, now the visits are twice a week. Mother was late for visits with K.P. about five times. There are no concerns with mother and K.P.'s interactions at visits. Mother's aunt requested placement of K.P., but was denied.

{¶ 35} Mother's aunt reported K.P. had lice twice during the time of the supervised visits. The first time, the friend found and took care of the lice and K.P. missed a visit with mother. The second time, mother found the lice in K.P.'s hair.

## Mother

{¶ 36} K.P.'s mother testified as follows. LCCS first became involved in 2012 or 2014, when mother and K.P. were living with father and father relapsed on drugs. LCCS became involved again in February 2016, because father overdosed in K.P.'s presence. Mother received a call while she was at work and left work to pick up K.P.

{¶ 37} Mother was given a case plan which included two substance abuse drug assessments, mental health assessment, two sessions of counseling and parenting classes.

13.

Mother completed all of the services except the second session of counseling, which she was currently attending. Mother has worked at Darlington Nursing Home and Rehab Center since March 2017. She worked second shift until May 2017, when she started working first shift. While mother had custody of K.P. it was very difficult to keep all of K.P.'s counseling and doctor appointments, so mother asked uncle for help.

{¶ 38} At the beginning of the case, mother and the friend were friends, but the relationship dwindled. Mother's reason was after she regained custody of K.P. and brought K.P.'s belongings home, 90 percent of the items had been purchased by mother, even though the friend had gotten child support from mother and father. Mother admitted posting disparaging remarks about the friend on Facebook.

{¶ 39} Mother acknowledged K.P. has a relationship with the friend, and never denied visits between K.P. and the friend after mother regained custody; mother said the friend never called or texted. However, mother never contacted the friend to arrange a visit with K.P.

{¶ 40} In April 2017, when mother had custody of K.P., mother called 911 because father overdosed. Mother insisted K.P. was not present, as K.P. was with her grandmother that day. Mother denied stalking father or hitting father with a car.

{¶ 41} On May 19, 2017, mother was in a car accident and had a brain bleed. After mother was discharged from the hospital, she went to father's house because she was not able to walk or carry herself and father offered to help. At that time, K.P. was

14.

staying at uncle's home and mother talked to K.P. on the phone. Mother stayed at father's house for about one month.

{¶ 42} Regarding the incident with uncle, mother texted uncle that she hoped he was not planning to drink and drive when K.P. was with him, "[a]nd it blew up from there." Mother has not talked to uncle since K.P. went to live with the friend. Mother does not believe she contributed to making K.P.'s placements at the friend or uncle's less stable.

{¶ 43} Mother visits with K.P. once or twice a week and the visits are going very well. With respect to finding lice, mother said K.P. was infested with lice, so mother went to the store, bought stuff and treated K.P.'s hair.

{¶ 44} Mother has owned her own home since March 2016, and K.P. has a room there. Mother is able to financially support the home and K.P. Mother believes it is in K.P.'s best interest for the court to grant mother custody. If she were granted custody, mother would follow all court orders. Mother has the support of her aunt, cousins, other family members and friends.

### The Appeal

{¶ 45} We will address mother's assignments of error in reverse order. In the third assignment of error, mother argues the juvenile court applied the incorrect standard of review in reviewing the magistrate's decision. Mother contends the juvenile court cited the correct standard of review, de novo, in the judgment entry but improperly applied the appellate standard of review, abuse of discretion, to the magistrate's decision.

15.

Mother notes "upon summarizing its decision, [the court] stated: '[t]he Court finds, therefore, that Mother's objection presents no evidence to demonstrate a mistake of fact, an error of law, nor **an abuse of discretion** by Magistrate.'" In support, mother cites to *In re J.P.*, 10th Dist. Franklin No. 16AP-61, 2016-Ohio-7574.

### Law and Analysis

**{¶ 46}** Juv.R. 40(D)(4)(d) states in relevant part:

> If one or more objections to a magistrate's decision are timely filed, the court shall rule on those objections. In ruling on objections, the court shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law.

**{¶ 47}** It is generally presumed the trial court conducted an independent review of the magistrate's decision. *Kime Design, LLC v. Aouthmany*, 6th Dist. Lucas No. L-11-1162, 2012-Ohio-3183, ¶ 34. Thus, the party asserting error must affirmatively demonstrate the trial court failed to undertake an independent review of the magistrate's decision. *Id. See also In re Taylor G.*, 6th Dist. Lucas No. L-05-1197, 2006-Ohio-1992, ¶ 19-21.

**{¶ 48}** In *In re J.P.*, it was noted that the juvenile court initially cited the appropriate standard of review, de novo. *Id.* at ¶ 14. However, it was further noted that the juvenile court decision's case contained "numerous instances where the juvenile court unequivocally applied an appellate court standard of review." *Id.* at ¶ 24. In the

16.

appellate court's view, although the juvenile court initially cited the proper standard of review, "the juvenile court's clearly expressed application of the appellate standard of review in this case distinguishes it from * * * *Mattis* and *In re H.D.D.* and overcomes the presumption of regularity typically afforded to such decisions." *Id.* at ¶ 25. The appellate court held the juvenile court erred in applying the appellate standard of review when ruling on objections to the magistrate's decision rather than conducting an independent review "to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." *Id.* at ¶ 33.

{¶ 49} In *Mattis v. Mattis*, 10th Dist. Franklin No. 15AP-446, 2016-Ohio-1084, cited by the court in *In re J.P.*, it was argued that the trial court failed to conduct an independent review when the court overruled her objection to the magistrate's decision. *Id.* at ¶ 8. It was asserted the trial court applied the incorrect standard of review because the court stated that the magistrate did not abuse her discretion. *Id.* The relevant language of the trial court's decision provided "[t]his Court FINDS that the magistrate properly considered the totality of the factors and did not abuse her discretion. Therefore the Magistrate's Decision * * * shall be APPROVED AND ADOPTED by this Court." *Id.* at ¶ 16. The appellate court ruled "[a]lthough the trial court does reference the magistrate's discretion in this paragraph, it is clear from the overall decision that the trial court applied an independent review. The trial court referenced the correct standard of review by stating it was required to undertake an independent review as to the objected matters." *Id.* at ¶ 17. "Moreover, the trial court stated it reviewed all the submitted

17.

evidence and 'the entire file and the applicable law' in reaching its decision." *Id.* "With a reading of the trial court's decision in its entire context, we conclude that the trial court did conduct an independent review and the trial court's semantic misstep in using 'abuse of discretion' does not amount to prejudicial error." *Id.*

{¶ 50} In *In re H.D.D.*, 10th Dist. Franklin No. 12AP-134, 2012-Ohio-6160, also cited by the court in *In re J.P.*, it was argued that the juvenile court improperly deferred to the magistrate and the court did not conduct a de novo review. *Id.* at ¶ 91. The appellant relied on certain statements in the court's judgment including "'the evidence was sufficient to support the Magistrate's findings, and thus he did not abuse his discretion'; 'the Magistrate was on strong footing in finding * * * by a preponderance of the evidence'; and '[t]he evidence presented at trial was sufficient to support the Magistrate's findings, and thus he did not abuse his discretion in finding * * *.'" *Id.* The appellate court held "[t]he excerpts quoted above from the trial court's written decision do not overcome the presumption of regularity to which the trial court is entitled. We read those excerpts not as statements of deference to the magistrate but, rather, as statements of concurrence with the magistrate." *Id.* at ¶ 94.

{¶ 51} Here, the relevant language in the juvenile court's judgment entry provides:

Mother's objections are addressed below. Based upon the Court's de novo review of this matter, including the objections, the record, and the transcript of the hearings before Magistrate Manning, the Court finds as follows. * * * Mother argues that the Magistrate is required to make a

suitability finding before determining what is in the minor child's best interest. After reviewing the relevant case law, the Court finds, however, that the Ohio Supreme Court is clear on this subject * * * The Court finds, therefore, that Magistrate Manning was not required to make a suitability finding. Mother's objection is denied. Mother also objects to the Magistrate failing to cite the required factors pursuant to RC 2151.414(D). * * * After reviewing the record, the Court finds that, in her Magistrate's Decision, Magistrate Manning properly found, by preponderance of the evidence, that legal custody to [the friend] is in the minor child's best interest. The Court finds, therefore, that Mother's objection presents no evidence to demonstrate a mistake of fact, an error of law, nor an abuse of discretion by Magistrate. Accordingly, Mother's objection is denied.

{¶ 52} Upon review, it is apparent from the judgment entry that the juvenile court undertook an independent examination of the matters to which mother objected, reviewed the record and the testimony presented. Although the juvenile court, in summarizing its findings, referred to the magistrate's discretion, this passing reference was not prejudicial to mother. *See Hine v. Hine*, 6th Dist. Wood No. WD-18-023, 2019-Ohio-734, ¶ 4-7. We therefore find mother has not affirmatively demonstrated the juvenile court failed to undertake an independent review of the magistrate's decision. We further find the juvenile court conducted a de novo review and determined the magistrate properly

19.

decided the factual issues and appropriately applied the law. Accordingly, mother's third assignment of error is not well-taken.

## Second Assignment of Error

{¶ 53} Mother asserts the trial court failed to consider the required factors in determining the best interest of the child. Mother argues the magistrate failed to undertake an analysis regarding the best interest of the child and the court failed to consider the required factors in its determination of the best interest of the child. Mother contends it does not appear from the magistrate's decision or judgment entry that any of the required best interest factors were weighed. Mother cites to R.C. 3109.04(F)(1), which sets forth best interest factors, and notes none of these factors were cited in the judgment entry.

## Law and Analysis

{¶ 54} R.C. 2151.353(A)(3) provides that the juvenile court may award legal custody of child, who was adjudicated neglected or dependent, to a person other than the child's parents. When a nonparent moves for legal custody of a child, R.C. 2151.353(A)(3) does not require the juvenile court to find the award of legal custody is in the child's best interest. *In re A.B.*, 2018-Ohio-4206, 114 N.E.3d 421, ¶ 10 (6th Dist.). Nevertheless, the underlying deliberation for all dispositional decisions made by the juvenile court regarding child custody "are based upon consideration of the best interest of a child and the constitutional and other legal rights of the parents." *Id.* As there is no requirement for the juvenile court to consider all of the best interest factors set forth in

20.

either R.C. 2151.414(D) or R.C. 3109.04(F) when awarding legal custody of a child to a nonparent, "we must presume the juvenile court is free to consider any best interest factors it deems appropriate." (Citation omitted.) *Id.* at ¶ 11.

{¶ 55} Some best interest factors which the juvenile court could consider in awarding legal custody of the child include: the wishes of the child; the custodial history of the child; the child's need for a legally secure permanent placement; whether the parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse; the wishes of the parents; the child's interaction and interrelationship with other family members or others who may significantly affect the child's best interest; the child's adjustment to home, school and community; the likelihood the caregiver would honor and facilitate or had honored and facilitated visitation and parenting time; and whether support orders have been followed. *See* R.C. 2151.414(D)(1) and (E) and R.C. 3109.04(F)(1).

{¶ 56} Here, a review of the record shows the juvenile court considered relevant best interest factors in awarding legal custody of K.P. to the friend. We therefore find since there were no required factors for the juvenile court to consider in determining the best interest of K.P., there is no error. Accordingly, mother's second assignment of error is not well-taken.

### First Assignment of Error

{¶ 57} Mother argues the juvenile court's decision was against the manifest weight of the evidence, as the evidence does not support the court's judgment terminating

21.

or severely limiting her parental rights. Mother contends the judgment entry's notations contain a summary of the caseworker's concerns regarding mother allowing K.P. to have contact with father, mother's continued relationship with father and mother's mental health services. Mother asserts the evidence shows the last time mother was in father's presence was in June 2017, and there is no evidence of an ongoing relationship. Mother submits during the time she was temporarily staying with father after her car accident, K.P. stayed with uncle and K.P. did not have any contact with father.

{¶ 58} Mother observes the parties' likelihood of following a custody order or encouraging parenting time with important people was discussed at the trial, but was not listed in the magistrate's decision. Mother maintains she was criticized by the caseworker for allegedly not allowing the friend to have continued contact with K.P. Mother claims her actions were not unreasonable, given the situation where reunification had just occurred, and should not be given any weight by the juvenile court. Lastly, mother asserts she was criticized for her engagement in the services provided by LCCS, but she was compliant with the services.

## Law and Analysis

{¶ 59} A juvenile court's decision to award legal custody to a nonparent "must be supported by a preponderance of the evidence admitted at the dispositional hearing." *In re A.B.* at ¶ 11. "'A preponderance of the evidence means evidence that's more probable, more persuasive or of greater probative value. It's the quality of the evidence

22.

that must be weighed.'" (Citation omitted.) *State v. Finkes*, 10th Dist. Franklin No. 01AP-310, 2002 Ohio App. LEXIS 1422 (Mar. 28, 2002).

{¶ 60} Appellate courts review a juvenile court's legal custody determination for an abuse of discretion. *In re A.B.* at ¶ 12. An abuse of discretion indicates the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 61} Here, as set forth above, the juvenile court considered relevant best interest factors in awarding legal custody of K.P. to the friend. The record shows K.P.'s expressed wishes were to live with the friend and visit mother. K.P. has known the friend all of K.P.'s life and has lived with the friend, on and off, for several years. Since LCCS's involvement with the family in 2016, K.P. has had constant upheaval in her living arrangements, as she has moved four times and has lived in three households. During the time K.P. has lived with the friend, K.P. was provided with a safe and stable home, and K.P. has done very well. In addition, the friend has facilitated visits between K.P. and mother and other family members.

{¶ 62} While K.P. was living with mother, mother did not always put K.P.'s needs first, made some poor choices regarding K.P. and demonstrated problematic behavior toward father. Although mother desires to regain custody of K.P. and has completed her services, there was evidence that mother was merely going through the motions and not really benefitting from the services by making the changes necessary to provide K.P. with a safe, stable environment.

23.

**{¶ 63}** The record further reveals it was the recommendation of the CASA/GAL and the caseworker that legal custody of K.P. be awarded to the friend. The uncle also favored awarding legal custody of K.P. to the friend.

**{¶ 64}** We find, based upon a thorough review of the record, that the juvenile court did not abuse its discretion in granting legal custody of K.P. to the friend and her partner. The juvenile court considered all relevant best interest factors before awarding legal custody of K.P. and its decision in weighing those factors in favor of the friend and her partner is supported by a preponderance of the evidence and is not arbitrary, unconscionable, or unreasonable. Accordingly, mother's first assignment of error is found not well-taken.

**{¶ 65}** On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                    _____
                                              JUDGE
Thomas J. Osowik, J.

Christine E. Mayle, P.J.            _____
CONCUR.                                       JUDGE

                                     _____
                                              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.