[Cite as *Ijakoli v. Alungbe*, 2024-Ohio-5287.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| ELIZABETH IJAKOLI, | : | APPEAL NOS. | C-230665 |
| | | | C-230673 |
| Plaintiff-Appellee, | : | TRIAL NO. | DR-1701029 |
| vs. | : | | |
| GABRIEL ALUNGBE , | : | | |
| | | *O P I N I O N* | |
| Defendant-Appellant. | : | | |

Appeals From: Hamilton County Court of Common Pleas, Domestic Relations Division

Judgments Appealed From Are: Affirmed in Part and Appeals Dismissed in Part

Date of Judgment Entry on Appeal: November 6, 2024

*Legal Aid Society of Greater Cincinnati* and *Niara Stitt,* for Plaintiff-Appellee Elizabeth Ijakoli,

*Gabriel Alungbe,* pro se.

**BOCK, Presiding Judge.**

{¶1} High-conflict divorce, marked by repetitive litigation, embroils children in a never-ending cycle of turmoil and crisis. High-conflict divorce is generally incompatible with a child's best interest.

{¶2} In these consolidated appeals, defendant-appellant Gabriel Alungbe ("Father") challenges the trial court's denial of his postdecree motions to modify custody and request for make-up parenting time. He also challenges the trial court's declaration that Father is a vexatious litigator. He argues that these decisions should be reversed in three assignments of error. Unpersuaded, we overrule two assignments of error and affirm the trial court's decisions, and dismiss his appeals, in part.

{¶3} First, the trial court applied the correct legal standard and weighed the relevant best-interest factors when it denied Father's motions to modify the custody order. The evidence demonstrated that modification was not warranted because Father's conduct contributed to a combative familial dynamic and negatively affected Son and Daughter, and Mother had provided support to address Son's behavioral and emotional issues.

{¶4} Second, we previously denied Father leave to appeal the trial court's order finding plaintiff-appellee Elizabeth Ijakoli ("Mother") in contempt of the parenting-time order but denying Father compensatory parenting time. We lack jurisdiction to consider the merits of his claims and dismiss this portion of his appeals.

{¶5} Third, Father forfeited any challenge to the trial court's vexatious-litigator declaration when he failed to object to Mother's motion.

## I.    *Factual and Procedural History*

{¶6} Father and Mother are the parents of Son and Daughter and were divorced by decree on December 23, 2019. The decree designated Mother as the

residential parent and legal custodian of the children. Father was granted parenting time every weekend, from Friday night to Sunday night.

{¶7} Both parties filed numerous postdecree motions. Father filed 46 postdecree pro se motions, though eight were combined motions. He filed 15 guardian-ad-litem ("GAL") related motions, 14 motions to modify custody, 11 motions for contempt, four motions to modify the parenting order, three motions to prohibit Mother from relocating outside of the school district, two motions for a refund of support or Social-Security-Disability payments, two motions for an order instructing Mother to sign government documents, and individual motions for temporary restraining orders to prevent Mother and Son's school from evaluating Son for a learning disability, for court-ordered medical treatment for Son, for access to the children's school records, for an order prohibiting Mother from using Father's name and her family from pestering Father, and for an order instructing the Dispute Resolution Center to return his evidence. We have affirmed a few of the trial court's decisions denying Father's motions. *See Ijakoli v. Alungbe*, 2022-Ohio-2423, ¶ 1 (1st Dist.) (affirming two evidentiary decisions in a custody-modification hearing); *see also Ijakoli v. Alungbe,* 2023 Ohio App. LEXIS 1284, *1 (1st Dist. Apr. 19, 2023) (dismissing his challenge to the trial court's denial of his motion to terminate the GAL because of defects in his notice of appeal and his challenge to the magistrate's denial of his motion to reallocate GAL fees for lack of a final, appealable order).

{¶8} Several of Father's custody-modification motions are relevant here. In July 2022, Father moved to modify the custody order, citing then 13-year-old Son's mental-health, academic, and behavioral struggles. He alleged that both children were underfed, "exposed to sexual abuse," neglected, and abandoned. He claimed that Son was physically abused by Mother's male friend and speculated that Daughter was, too.

He maintained that Mother was incapable of supporting the children's academic needs and falsified her education records. In support, he attached 16 pages of exhibits consisting of text messages, photographs of the children in front of a police station and Mother's apartment, and a letter from Son to Father describing the lack of food in Mother's house. Son's letter was written during Father's parenting time.

{¶9} He filed three similar motions to modify custody in October 2022. He filed two separate motions for modification on October 18, 2022. The first motion alleged that Mother was incapable of providing academic support to the children and deprived them of "physiological, safety, and psychological needs." Father attached 52 pages of exhibits that included police reports filed against Mother for failing to exchange Son and interfering with his parenting time, and Mother's academic records from 2010 to 2014. The second motion was identical to his July 2022 motion.

{¶10} Five days later, Father filed another motion and claimed that Mother was incapable of supporting the children's academic needs and deprived them of physiological and safety needs. He also alleged that the children "[were] suffering abuse and neglect," underfed, and uncared for. He repeated his claim that Mother's male friend physically abused Son.

{¶11} In mid-November 2022, Father filed two motions to modify the custody order. In his first, he argued that Son's expulsion from school warranted an emergency modification. In his second, he raised additional arguments related to Son's expulsion.

{¶12} There are also several contempt motions relevant to this appeal. Father moved for an order finding Mother in contempt of the parenting time order on October 18, 24, and 31, November 14, and December 5, 2022. In each, he claimed that Mother failed to exchange the children on multiple weekends in 2021 and 2022, resulting in 116 lost parenting-time days with Son and six lost parenting-time days with Daughter.

**{¶13}** For her part, Mother filed nine postdecree motions, including three motions to modify the parenting order, two motions for contempt, and individual motions for a psychological evaluation, reconsideration of GAL fees, an in-camera interview, to keep her records confidential, and a declaration that Father is a vexatious litigator under R.C. 2323.52.

### *Custody and contempt hearing*

**{¶14}** The trial court held a hearing on Father's motions for custody and contempt. At the time, Father had 11 custody-modification motions pending. Because the trial court had previously denied requests to modify the custody order, the hearing focused on events after June 23, 2021. Son's GAL, Son's Legal Aid attorney, Father, and Mother testified.

### A. *Custody modification – best interests of the children*

#### 1. *Son*

**{¶15}** The GAL testified and described Son's struggles. Since June 2021, Son had "about six suspensions and expulsions, and delinquency complaints." He was suspended in seventh grade for having a vape pen on school grounds. He was hospitalized for suicidal ideation, where medical professionals diagnosed him with posttraumatic-stress disorder ("PTSD") and impulse-control disorder. According to the GAL, Son's PTSD is the product of "extreme parental conflicts." Son informed the GAL that "my dad says the most horrific things about my mom. Mom is much more quiet. That's just not her way. And again, I was made to, like, tape Dad hurting Mom."

**{¶16}** Son's eighth grade started "pretty well." But Son was alleged to be delinquent in two complaints filed in the Clermont County Juvenile Court in the fall of 2022. Then, he was suspended from school from October 2022 to March 2023 for chronic misbehavior and sexual harassment. In the spring of 2023, Son was

adjudicated delinquent for fighting another child and received a 60-day sentence.

{¶17} Around this time and with the help of a Legal Aid attorney, Son started receiving accommodations under a 504 plan. Mother had initiated the process out of concern for Son's struggles. Despite his suspension, Son managed to earn two A-plusses in electives and a B in science. He struggled in English and did not pass math or social studies.

{¶18} Son's school suspended him at the beginning of his ninth-grade school year for posting a picture of a firearm on social media, suggesting it was a school supply, and for other inappropriate social media posts directed at students.

{¶19} Son's Legal Aid attorney described the 504-plan process. With experience in 150-200 education cases, she confirmed that a 504 plan would benefit a child diagnosed with PTSD because the child would receive "additional supports" to make the curriculum more accessible. Mother worked to ensure that Son received therapeutic services and signed him up for therapy with Child Focus. The Legal Aid attorney testified that Father was "adamantly opposed to getting a 504 plan put in place," partially due to the stigma.

{¶20} The GAL applauded Father's involvement in the children's lives but was concerned with his tendency to tell school employees that Mother prevents his involvement in his children's education. Father immediately brings up "personal family issues." Moreover, he tried to subvert the 504-plan process in emails accusing a school administrator of being a bigot who "doesn't care about young black male youth." Other emails to the school argued that Son "doesn't need a 504" and instead needs "a parent who knows what they are doing because [Mother] is allegedly uneducated and inept." Father threatened that the school would have to defend "against those sorts of allegations."

6

{¶21} Mother described the events that led to Son's hospitalization and diagnoses. She learned that Son was using drugs and reached out to "all the necessary people" for help. Before delinquency hearings, "he gives me some form to make sure he's not doing drugs, and he's been doing pretty good." He has been drug tested by the juvenile court and no drugs were found in his system. He currently attends school every day, though homework is "a tug-of-war." But she encourages him. She explains the importance of school and threatens punishment if he refuses. Sometimes he does not listen, sometimes he lashes out. Mother was upset "because everything looks like it's my fault, and it was stated by [Father] that everything is my fault." So, she tries hard to ensure Son completes his schoolwork.

{¶22} Mother realized Son needed additional support. She hired a tutor for him. And Mother, Son's hospital, and Child Focus agreed that he needs a 504 plan. In response, Father bullied Mother, resisted, and remarked that Son "has the brain of a five-year-old." Son's 504 plan was finalized when he was in eighth grade.

{¶23} The GAL interviewed Son, who recalled that his father forced him to film Father physically abusing Mother. As a result, Son had "a whole lot of anger" towards his father and warned the GAL that, if Son was "in the presence of [Father], something physical will happen. I will hurt him." He has a "burning hatred" for Father. The GAL believed Son and was concerned that if Son had more time with Father, he might "commit a very serious offense against his father" and "try to cause him physical harm or kill him" with a weapon, "and then inescapably be entrenched in the criminal justice system."

{¶24} Son told the GAL that allegations that he and Daughter were exposed to sexual acts were false. Son admitted that he tests Mother and is rude to her, but she "is doing the best she can." Son wants to be a nurse, like Mother, when he grows up.

7

{¶25} While Father and Son love one another, the GAL expressed concern over Father's focus "on how smart [Father] is, how academically excellent he is, and how he can make both, you know, both kids, these wonder prodigies." Rather, the children needed emotional support. Neither Father or Mother were to blame for Son's situation, but "[t]he family dynamic is at fault and [Son] needs help or we are going to lose this kid." The GAL stated that there was a "huge disconnect between what this kiddo actually needs . . . connecting with him and giving him those things that he needs" rather than "sitting down and memorizing something."

{¶26} The GAL concluded that Son must receive therapy and treatment, and that Son and Father needed therapeutic intervention. While Father "has wonderful things to provide his kiddo[]s, . . . there needs to be some assistance in terms of the family dynamics about a healthy way to do that with [Son]." Son will receive therapeutic intervention under his 504 plan.

{¶27} Mother testified that her relationship with Son was good, "can be better," and fluctuated—"sometimes it's worse." When it was good, it was "[v]ery beautiful"—Son was affectionate and wanted to spend time with Mother. When the relationship was bad, Son was upset, cursed at Mother, blamed her, and slammed things. Mother scheduled therapy for Son and attended some therapy sessions with him, which improved their relationship. Mother explained that her male friend has known the children for years and has never "put his hands on the children" or abused them in any form.

{¶28} Mother gave Son the opportunity to go to Father's home every weekend, encouraging Son "religiously," but Son's answer was always "no." Mother recalled that Father called the police on Son when he was nine years old because he "tore out a page of the book he was supposed to be reading." Son seemed afraid of Father after the

police were called. Son's demeanor went "from zero to 100 real fast" and he "stopped going there." Son told Mother that, if he visited Father's home, "something bad is going to happen, or I will run away." Sometimes Mother took Son to the police station for Father's parenting time, but she "cannot physically drag him out of the car." In fact, Mother punished Son for not going to Father's home during his parenting time. She explained that she had moved the children because Father was stalking her.

{¶29} Mother struggles to coparent with Father, who constantly messaged her at odd hours, usually "to make fun of me, something to, you know, bully me, something to make me cry, something to make me, you know, just uncomfortable." He has sent her explicit photos and falsely accused her of a wide range of indecencies. In court, he has had outbursts "saying things, that I am not educated," and twice unsuccessfully filed for protection orders against her. As a result, she has arranged for neighbors to watch, as proof, her children get on the school bus. These things have affected her ability to coparent. Mother acknowledged that she did not compile the children's school supplies for the school year—she could not find the "yellow blue binders that [Daughter] requested."

{¶30} Father testified and blamed Mother for Son's struggles. Going through the best-interest factors, Father testified that he wanted full custody of the children and awarding him custody is in the children's best interests. He recalled frequently visiting the children's schools to sign paperwork ensuring that his children receive lunch. Plus, Father alleged, Mother fed the children fast food and pop tarts at home. Father had not seen Son for roughly 15 months. He testified that he never had an opportunity to see if he could make a difference in his Son's life.

### 2. *Daughter*

**{¶31}** The GAL described Daughter as a loving child who will do "whatever she needs to do to make both parents happy." But, the GAL noted, "she has a sadness about her" because of "the acrimonious discord in the family dynamics as well because the constant strife with [Son], because that affects everyone." Daughter did not want a change in parenting time.

**{¶32}** According to the GAL, Daughter spoke "glowingly about how [Mother] prepared traditional African food and how it's her favorite." Father "does it, too." Daughter "gets to help her mom make the food." Son "talked about the same thing." The GAL saw evidence in Mother's kitchen that pots and pans were recently used. Both children appeared healthy and nourished, and the GAL had no concerns about the children's meals.

**{¶33}** Mother testified that she has a close relationship with Daughter and described the activities the two do together. Daughter and Son often play after school, and Son sometimes joins Mother and Daughter when watching television before bedtime. Mother and Daughter cook "traditional foods like Jollof rice . . . and other foods that she might be interested in eating and wanting to know how it's prepared."

**{¶34}** Mother recalled times when Daughter's self-esteem suffered after Daughter's time with Father. She described a specific weekend where Daughter forgot to do her homework. Daughter asked to not go to Father's home "because she's afraid she's going to be called dumb like [Mother]." Daughter explained to Mother, "that's what [Father] usually say[s], that [Mother] [is] dumb." Mother testified that Father made "phony statements about me in [Daughter's] presence." Mother was concerned that Father might harm Daughter and blame Mother.

**{¶35}** Father testified that he has a "[g]reat" relationship with Daughter. When he is with Daughter during his parenting time, they attend church and go to the YMCA and library. Father testified that Daughter shows no sign of depression when she is with him.

### B. Contempt hearing

**{¶36}** The trial court incorporated the custody-modification testimony into the contempt portion of the hearing. Mother also testified that she has offered Father makeup time for the time that he missed with his children. Father replied that Mother is not the court and cannot adjust parenting time or tell him when to keep the children and make up the lost parenting time with Daughter. Father testified that Mother has thwarted his attempts to take the children on vacation. Father explained that his experiences in the trial court have made him cautious about acting without court permission "because it could be used against [him]."

### The trial court's decisions

**{¶37}** At the hearing, the trial court ordered Father not to text or email Mother unless he has Daughter and there is an emergency. It instructed Father to respond to Mother's motion to declare him a vexatious litigator within 14 days.

### A. The trial court denied Father's custody-modification motions

**{¶38}** The trial court denied Father's motions to modify the custody order. In the order, it made extensive factual findings related to Father, Mother, and the GAL's testimony. The trial court identified four best-interest factors under R.C. 3109.04(F)(1) relevant to this case and concluded that a change of custody was not in the children's best interests. The trial court issued several orders that (1) temporarily suspended Father's parenting time with Son, (2) continued his parenting time with Daughter, (3) granted Mother discretion to extend Father's parenting time, (4)

continued Mother's work with Child Focus and instructed her to use a crisis-response team if Son experiences a crisis, (5) restricted Father and Mother's communication to a court-approved app (absent an emergency), (6) prohibited physical punishment, (7) prohibited Father from demeaning or criticizing Mother to any third-party professionals, and (8) ordered Father to undergo counseling.

## B. The trial court found Mother in contempt, but declined to award Father compensatory parenting time

**{¶39}** The trial court issued an order finding Mother in contempt of the parenting order because she denied Father's court-ordered parenting with Daughter on six occasions. Mother was not in contempt, however, for interfering with Father's parenting time with Son because she "had a 'reasonable, good faith belief' that her denial of visitation [with Father] would protect [Son]'s safety." While it found Mother in contempt of the custody order based on her denying Father's parenting time with Daughter, it did not order compensatory parenting time because additional time would not be in Daughter's best interest "[b]ased on the effect [Father]'s parenting is having on the older child."

## C. The trial court declared Father a vexatious litigator

**{¶40}** The trial court granted Mother's motion to declare Father a vexatious litigator under R.C. 2323.25. Curiously, Father did not file a response challenging Mother's motion, despite having received a one-month extension to respond.

**{¶41}** The trial court found that Father "lack[ed] a warranted or good-faith basis for nearly all of the 14 motions he filed between March 11, 2022 and December 21, 2022." It noted that the frequency of Father's filings had accelerated in 2023. Since the divorce was finalized, his filings were "repetitive, unwarranted, and/or fail to articulate a reasonable justification for any changes to existing law or court orders." It

pointed to seven custody-modification motions that cited "essentially the same basis" for a change of custody. It found that Father used these motions "as a mechanism to harass [Mother]," with "voluminous documents containing disparaging allegations and remarks towards Mother."

**{¶42}** The trial court prohibited Father from filing motions in the case without leave of the trial court. It instructed the Hamilton County Clerk of Courts to only accept Father's filings that included "express written consent" of the trial court.

**{¶43}** Father appealed the trial court's custody, contempt, and vexatious-litigator decisions, which were consolidated. Father raises three assignments of error.

## II. *Analysis*

### A. *Custody modification is contrary to the children's best interests*

**{¶44}** In his first assignment of error, Father claims that the trial court failed to adequately weigh the best-interest factors and fully consider which parent would help the children succeed in life.

**{¶45}** We review the trial court's decision to deny a motion for custody modification for an abuse of discretion. *In re A.C.,* 2019-Ohio-2891, ¶ 12 (1st Dist.). To prove that the trial court abused its discretion, Father must show that the trial court's decision is unreasonable, arbitrary, or unconscionable. *See Miller v. Miller,* 37 Ohio St.3d 71, 73 (1988), quoting *Blakemore v. Blakemore*, 5 Ohio St. 3d 217, 219 (1983).

**{¶46}** Child-custody decisions "are some of the most difficult and agonizing decisions a trial judge must make." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418 (1997). We afford "wide latitude" to the trial court's consideration of the evidence. *Id.* We give the trial court """great deference""" in its credibility determinations and weighing of the evidence. *In re J.M.,* 2022-Ohio-2400, ¶ 10 (1st Dist.), quoting *Davis* at 420, quoting *Pater v. Pater*, 63 Ohio St.3d 393, 403 (1992) (Resnick, J., concurring in part

and dissenting in part). This deference is "crucial" because, in child-custody cases, "there may be much evident in the parties' demeanor and attitude that does *not* translate to the record well." *Davis* at 419. We will not reverse the trial court's judgment if it is supported by competent and credible evidence. *In re A.C.* at ¶ 12.

**{¶47}** Modifying an existing custody order under R.C. 3109.04(E)(1) requires a threshold finding that facts arising after the previous decree, or facts unknown to the court, indicate a change in circumstances for the child, the residential parent, or other guardian subject to a shared-parenting decree. R.C. 3109.04(E)(1)(a). The trial court found a change of circumstances, which the parties do not dispute.

**{¶48}** Next, the trial court must find that "modification is necessary to serve the best interest[s] of the child[ren]." *Id.* The children's best interests are the "overriding concern in any child custody case." *Miller,* 37 Ohio St.3d at 74. Best-interest determinations must be guided by "all relevant factors, including but not limited to" ten statutory factors enumerated under R.C. 3109.04(F)(1). The trial court analyzed the case under four of those ten best-interest factors:

(a) The wishes of the child[ren]'s parents regarding the child[ren]'s care;

. . .

(c) The child[ren]s's interaction[s] and interrelationship[s] with the child[ren]'s parents, siblings, and any other person who may significantly affect the child[ren]'s best interest;

(d) The child[ren]'s adjustment to the child[ren]'s home, school, and community;

(e) The mental and physical health of all persons involved in the situation. . . .

R.C. 3109.04(F)(1).

14

**{¶49}** The trial court recognized both Mother's and Father's desires to be the children's sole residential parent and legal custodian. It cited Mother's account of her close and loving relationship with the children and the GAL's description of Father's estranged relationship with Son. Turning to the children's adjustment, the trial court found that Son is not well adjusted to school or his community, and Daughter needs "relief from the ongoing parental conflict" to continue being well adjusted to her home, community, and school. Regarding the mental and physical health of everyone involved in the case, it cited Father's tendency to respond to "questions about his children's wellbeing by repeating his own educational accomplishments," and the GAL's recommendation that Father receive counseling.

**{¶50}** It concluded that "the relentless conflict" has caused the children to suffer emotionally and academically. Specifically, Father's "insistence on the righteousness of his position, his degrading of [Mother], his inability to be accountable, and his nonstop initiation of often baseless litigation have taken a heavy toll on his children and [Mother]." According to the trial court, there was no evidence that awarding Father custody of the children would solve the family's problems.

**{¶51}** On appeal, Father argues that the trial court failed to consider a host of factors that he contends are dispositive of the children's best interests. He points to several of his exhibits to argue that the trial court failed to consider which parent would (1) provide a safe home for the children, (2) raise children less likely to abuse substances or commit crime, (3) cooperate with the other parent, (4) provide adequate health and dental care, (5) take the children on vacation, and (6) provide nutritious meals for the children. Presumably, Father contends that he is more likely to provide these things for his children. He also claims that the trial court failed to consider the mental and physical health of everyone involved.

**{¶52}** Father also emphasizes the children's academic needs, which he claims that the trial court failed to consider and weigh. He appears to argue that he is better suited to help the children succeed in school and life, improve their academic performance, ensure that they stay in school, be involved and engaged with the children's school, and involve the children in extracurricular activities.

**{¶53}** But Father ignores the trial court's consideration of these issues and ultimate finding that these interests are better served with the children in Mother's custody. We agree with the trial court's conclusion and, particularly, its finding that Father's conduct has had a detrimental effect on the family and his children, which is supported by the GAL's testimony and the record.

**{¶54}** Father's actions in and out of court have created a high-conflict divorce for his children. High-conflict divorce is "marked by a lack of trust between the parents, a high level of anger[,] and a willingness to engage in repetitive litigation." Linda D. Elrod, *Reforming the System to Protect Children in High Conflict Custody Cases*, 28 Wm.Mitchell L.Rev. 495, 499-500 (2001). Parents in a high-conflict divorce "often distrust each other, are afraid, angry, project blame onto the ex-partner, refuse to cooperate and communicate, make allegations of abuse, and sabotage each other's parenting." *Id.* at 508. These parents attempt to resolve tense and bitter conflicts through recurrent litigation. Stern, Simpson, Gage, and Worley, *Professionals' Perceptions of Divorce Involving Children*, 22 U.Ark.Little Rock L.Rev. 593, 593 (2000). This "combative atmosphere ma[k]e[s] it more difficult for divorcing couples to . . . develop a cooperative relationship." Elrod, 28 Wm.Mitchell L.Rev. at 502.

**{¶55}** Research shows that "[t]he level and intensity of parental conflict is now thought to be the most dominant factor in a child's post divorce adjustment and the single best predictor of a poor outcome." *Id.* at 496-497. Lasting conflict and recurrent

litigation throughout a child's life entangles the child in "perpetual turmoil," impedes the child's ability to regain a sense of normalcy, and increases the potential for alienation of the child. *Id.* at 508 and 510. Parents in high-conflict divorces "possess little insight into their own role in the conflict [and] fail to understand the impact of the conflict on their children." *Id.* at 510.

**{¶56}** Throughout this divorce case, Father has alleged that the children were exposed to inappropriate sexual acts in Mother's household and that Son was physically abused by his mother's male friend. At other times he alleged that Son was physically abused by Mother. But Son told the GAL that those allegations were "not true." Father has also consistently disparaged and demeaned Mother in court filings, repeatedly claiming that Mother does not and cannot assist the children with their education. He attaches emails to his children's teacher that include those statements. The evidence also shows that he disparaged Mother to his children.

**{¶57}** Courts have recognized that this all-too-common behavior in divorce cases has significant negative effects on children. *See Massong v. Tyner,* 2022-Ohio-2933, ¶ 27 (1st Dist.); *see also In re K.P.,* 2019-Ohio-2045, ¶ 62 (6th Dist.); *Canada v. Blankenship*, 2018-Ohio-4781, ¶ 38 (3d Dist.); *Firmage v. Snow*, 158 Idaho 343, 351 (2015); *Matter of Walsh v. Russell*, 186 N.Y.S.3d 281, ¶ 2 (2023*); Ingco v. Anderson*, 48 N.E.3d 898 (Ind.App. 2016). An oft-quoted letter written by one Minnesota family court judge cautions against this kind of disparagement:

> Your children have come into this world because of the two of you. Perhaps you two made lousy choices as to whom you decided to be the other parent. If so, that is your problem and your fault.

> No matter what you think of the other party—or what your family thinks of the other party—those children are one half of each of you.

Remember that, because every time you tell your child what an idiot his father is, or what a fool his mother is, or how bad the absent parent is, or what terrible things that person has done, you are telling the child that half of him is bad.

That is an unforgivable thing to do to a child. That is not love; it is possession. If you do that to your children, you will destroy them as surely as if you had cut them into pieces, because that is what you are doing to their emotions.

*Malmquist v. Malmquist,* 2011 Tenn. App. LEXIS 144, *99 (Tenn. Ct. App. Mar. 25, 2011), quoting Judge Don R. Ash, *Bridge over Troubled Water: Changing the Custody Law in Tennessee*, 27 U.Mem.L.Rev. 769, 771 (1997), quoting a letter from Judge Dotson Haas, Walker, Minnesota; *see K. D. v. M. H.,* 2004 Del. Fam. Ct. LEXIS 215, *23 (Jan. 5, 2004); *see also In re the Marriage of Miles,* 1995 Mont. Dist. LEXIS 867, *8 (Feb. 21, 1995); *In re Marriage of Fredrichsen*, 2011 Tex. Cnty. LEXIS 3958, *6 (Oct 24, 2011).

**{¶58}** The GAL testified that the familial conflict contributed to Son's PTSD diagnosis and risks having a similar negative effect on Daughter. There is evidence that Father's disparagement has already affected Daughter.

**{¶59}** The evidence also shows that Mother had taken steps to support Son's behavioral and academic struggles, as well as his emotional needs. She hired a tutor, found mental-health counseling for Son, attended sessions with him, and initiated the process that resulted in Son receiving assistance under a 504 plan through his school. In contrast, the record shows that Father attempted to thwart the 504-plan process and prevent Son from receiving accommodations.

**{¶60}** Father points to several of his exhibits in support of his claim that the trial court should have modified the custody order. But the trial court's order indicates that it found the GAL's and Mother's testimony credible. That testimony contradicts Father's evidence.

**{¶61}** Father also argues that Mother relied on photographs at the custody hearing that she had introduced in a prior hearing. According to Father, this violates the Fifth Amendment's Double Jeopardy Clause. But that constitutional guarantee protects against "the imposition of multiple *criminal* punishments for the same offense." (Emphasis in original.) *Hudson v. United States*, 522 U.S. 93, 99 (1997).

**{¶62}** In sum, competent and credible evidence established that the children's health and education are best served by preserving the existing custody order and denying Father's motions. We overrule Father's first assignment of error.

### B. *We lack jurisdiction to consider the second assignment of error*

**{¶63}** In his second assignment of error, Father challenges the trial court's decision to not award him compensatory parenting time after finding Mother was in contempt of the parenting time order. But we do not reach the merits of his argument because we lack jurisdiction to consider it.

**{¶64}** In December 2023, the trial court declared Father a vexatious litigator under R.C. 2323.52. Ohio's vexatious-litigator statute instructs a person deemed a vexatious litigator, "who seeks to institute or continue any legal proceedings in a court of appeals[,] . . . [to] file an application for leave to proceed in the court of appeals in which the legal proceedings would be instituted or are pending." R.C. 2323.52(F). In turn, the vexatious-litigator statute directs appellate courts to deny "leave for the institution [of] . . . legal proceedings in the court of appeals unless the court of appeals is satisfied that the proceedings or application are not an abuse of process of the court

and that there are reasonable grounds for the proceedings or application." *Id.*

**{¶65}** Father filed a motion for leave to appeal (1) the trial court's November 20, 2023 decision denying custody modification; and (2) the trial court's November 29, 2023 decision finding Mother in contempt but denying Father compensatory parenting time. We granted Father leave to "proceed with an appeal of the trial court's order denying his motions for reallocation of parental rights, entered by the trial court on November 20, 2023." But Father's motion for leave was "denied in all other respects."

**{¶66}** Under R.C. 2323.52(G), when a decision denies a person deemed a vexatious litigator leave to institute proceedings in the court of appeals, "no appeal by the person who is the subject of that order shall lie." This section of the vexatious-litigator statute "unambiguously prohibits an appeal from a court of appeals' judgment denying a motion to continue proceedings filed by a vexatious litigator." *State ex rel. Mobley v. Tyack*, 2023-Ohio-3673, ¶ 9.

**{¶67}** Because Father's appeal of the trial court's November 29, 2023, decision is prohibited under R.C. 2323.52(G), we lack jurisdiction to consider it and dismiss this portion of Father's appeal.

## C. *Father forfeited any challenge to being declared a vexatious litigator*

**{¶68}** In his third assignment of error, Father argues that the trial court erred when it declared him a vexatious litigator and limited his ability to file motions in this case. He claims that the trial court misapplied the law, violated his constitutional rights when it declared him a vexatious litigator, and imposed an undue restriction on his access to the courts.

**{¶69}** But Father has forfeited any challenge to the trial court's vexatious-litigator designation because he failed to oppose Mother's motion to declare him a vexatious litigator. Father asked for an extension to file a response to Mother's motion. The trial court granted it and ordered Father to file his response "on or before December 4, 2023." But inexplicably, Father failed to file a response. When a party fails to raise an objection to the trial court, he forfeits the right to assign it as error on appeal. *See Bender v. Durrani*, 2024-Ohio-1258, ¶ 69 (1st Dist.). And Father has not argued that the trial court committed plain error. When a party "fail[s] to advance a plain-error argument on appeal, this court will not create one on their behalf." *Id.*

**{¶70}** Because Father forfeited his challenge to Mother's motion to declare him a vexatious litigator and has not argued that the trial court committed plain error, we overrule his third assignment of error.

### III.   Conclusion

**{¶71}**   We overrule Father's first and third assignments of error and affirm the decisions denying Father's motion to modify the custody order and declaring him a vexatious litigator. We dismiss Father's appeal of the trial court's contempt order.

Judgments affirmed in part and appeals dismissed in part.

**CROUSE** and **WINKLER, JJ.,** concur.


Please note:

The court has recorded its entry on the date of the release of this opinion.